The Honorable Richard A. Jones

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

LOUIE SANFT and
SEATTLE BARREL AND COOPERAGE
COMPANY,

Defendants.

NO. CR19-258RAJ

**GOVERNMENT'S TRIAL BRIEF**

**TRIAL DATE:  November 30, 2021**

## I.    INTRODUCTION

Defendants Louie Sanft and Seattle Barrel & Cooperage Company ("Seattle Barrel") are charged with a 10-year conspiracy to secretly discharge industrial wastewater into the King County sewer system in violation of the Clean Water Act. Defendants are also charged with 29 substantive counts of violating the Clean Water Act by causing unlawful discharges; four counts of submitting false documents under the Clean Water Act; and two counts of making false statements to federal agents in violation of Title 18, United States Code, Section 1001.  The government anticipates that its case-in-chief will last approximately six trial days and expects to call between 15 and 20 witnesses.

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 1

## II.     BACKGROUND AND SUMMARY OF EVIDENCE

### A.     Louie Sanft and Seattle Barrel

Defendant Louie Sanft is the owner and general manager of Seattle Barrel, a barrel refurbishing company based in Seattle's SODO area.  Seattle Barrel's business involves collecting used industrial barrels (primarily 50-gallon drums), refurbishing them, and then redistributing them to industrial users.  Louie Sanft primarily worked in an administrative office across the street from the plant.  During the charged period, Louie Sanft's cousin, John Sanft, and another employee named Dennis Leiva-Escoto, were the onsite managers of the Seattle Barrel plant.  John Sanft is charged as a co-conspirator. Dennis Leiva-Escoto is an unindicted co-conspirator who is cooperating with the government.

Seattle Barrel's barrel refurbishing process involved stripping the paint, labels, and other material from the barrels.  To do so, workers submerged the barrels in a 300-gallon tank known as a "caustic bath."  The caustic bath was filled with a highly corrosive liquid known as "caustic solution."  Workers maintained the strength of the caustic solution by periodically adding sodium hydroxide beads to the tank.  This resulted in a very high pH level, which generally exceeded 12.  In addition, solids known as sludge accumulated at the bottom of the tank.

### B.     KCIW's Regulation of Seattle Barrel

The King County Industrial Waste Program (KCIW) regulates the discharges of industrial users like Seattle Barrel into the King County sewer system.  The sewer system is a "Publicly-Owned Treatment Works" (POTW) as defined by the Clean Water Act. KCIW is responsible for ensuring that the POTW is operated in compliance with the Clean Water Act.  To do so, KCIW issues Waste Discharge Permits to industrial users with conditions regulating the properties of industrial wastewater the user can discharge to the POTW.

Defendants applied for Waste Discharge Permits in 2009 and 2014.  The permit applications required defendants to disclose the chemicals Seattle Barrel used in its

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 2

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  operations, and how it disposed of the resulting wastewater.  In the 2009 and 2014

2  applications, defendants represented that Seattle Barrel did not discharge the caustic tank

3  wastewater to the sewer.  Instead, they represented that Seattle Barrel paid an offsite

4  disposal company called Emerald Services to collect and remove the caustic solution.

5         The 2009 and 2014 applications were approved based on defendants'

6  representations.  The issued permits included specific terms and conditions limiting

7  discharges to the sewer, and mandating monitoring requirements.  For example, the 2009

8  permit prohibited Seattle Barrel from discharging wastewater with a pH level in excess of

9  12.0.  Wastewater exceeding pH 12.0 is highly corrosive, potentially hazardous, and can

10  corrode or otherwise damage the sewer system.  The 2009 permit also required Seattle

11  Barrel to continuously monitor the pH level of its wastewater stream as it was discharged.

12  Seattle Barrel was also required to submit monthly self-monitoring reports disclosing the

13  amount and properties the wastewater it discharged to the sewer.  Louie Sanft prepared,

14  signed, and submitted these reports to KCIW.

15         In 2014, following several regulatory violations (which are discussed below),

16  KCIW added additional requirements to Seattle Barrel's permit.  The new requirements

17  were based on regulators' concerns that Seattle Barrel was secretly discharging its caustic

18  tank to the sewer and were imposed to prevent it from continuing to do so.  The

19  additional requirements included an express prohibition on "discharg[ing] the caustic

20  drum/barrel wash solution into the sanitary sewer system without prior approval from

21  KCIW," and a requirement that all wastewater "be routed to a KCIW approved

22  wastewater treatment system and sample site prior to being discharged."  The permit

23  required that Seattle Barrel only discharge through s a single drain, which was to be

24  subjected to continuous monitoring.

25  **C.**    **Events Leading up to KCIW's 2013 Monitoring**

26         Beginning in 2012, KCIW inspectors observed several apparent permit violations

27  and other incidents of concern at Seattle Barrel.  For example, in October 2012, a KCIW

28  inspector caught John Sanft in the act of pouring oily liquid into the sewer in violation of

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 3

1    the permit.  When the inspector confronted John Sanft, John Sanft jokingly told the

2    inspector "don't tell Metro" (an apparent reference to KCIW).

3        KCIW representatives subsequently met with Louie Sanft to discuss the incident

4    and express concern for Seattle Barrel's wastewater handling practices.  Louie Sanft told

5    KCIW that John Sanft had "acted for himself, not according to company procedures,"

6    and that he had been reprimanded.  KCIW issued the company a violation report and

7    levied a fine.  In appealing the fine, Louie Sanft acknowledged that John Sanft's conduct

8    was "not acceptable," but protested that "this is not how our company trains our

9    employees." Seattle Barrel and KCIW ultimately resolved the appeal, with an agreed fine

10   and an agreed factual statement that "an employee was observed manually bypassing the

11   final stage of the wastewater treatment system and associated discharge of concentrated

12   wastes that did not meet permitted discharge to the sanitary sewer."

13       Other inspections conducted during the same time identified additional instances

14   of Seattle Barrel mishandling its wastewater.  Less than a month after the incident

15   described above, a KCIW inspector discovered that Seattle Barrel was not monitoring the

16   pH level of its wastewater as required by the permit.  At a surprise visit a month after

17   that, the same inspector discovered a barrel of wastewater placed next to the sewer drain.

18   John Sanft initially claimed that the barrel did not contain caustic solution.  However,

19   after inspectors measured the pH level of the liquid (and found that it exceeded 12.0)

20   John Sanft retracted his earlier denial and admitted that the barrel in fact contained

21   caustic solution.  He could not explain why the barrel was placed next to the sewer drain.

22       KCIW conduced another surprise inspection on September 13, 2013.  Investigators

23   discovered barrels containing hazardous wastewater that appeared to have been hidden in

24   an area meant for storing empty barrels.  Investigators also discovered that someone had

25   drilled holes in the company's wastewater filtration system (oil water separator), which

26   could circumvent the system and allow pollutants to enter the sewer.  KCIW directed

27   Seattle Barrel to seal the holes.

28

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 4

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In October 2013, inspectors noticed an unusual piping system in the final sump from which Seattle Barrel's wastewater was discharged to the sewer.  It was the same sump KCIW sampled on a routine basis to assess whether Seattle Barrel's wastewater complied with permit conditions.  John Sanft and Louie Sanft provided inconsistent explanations for the piping.  Inspectors later determined that the piping was connected to a freshwater tank.  Tests of the system showed that this configuration allowed Seattle Barrel to flush the final sump and sample areas with uncontaminated water, which created the potential to circumvent KCIW's sampling efforts by diluting wastewater during KCIW sampling events.  KCIW ordered Seattle Barrel to remove the system.

**D.    2013 Monitoring by KCIW**

In 2013, based on concerns that Seattle Barrel was illegally discharging wastewater from the caustic tank to the sewer, KCIW installed pH monitoring devices in the sewer line immediately outside of Seattle Barrel.  One device was installed just upstream of the point at which discharges from the Seattle Barrel facility entered the sewer system.  The second device was installed just downstream from the same point. Placement of the devices in this manner allowed regulators to effectively isolate the Seattle Barrel discharges and determine the pH level and temperature of wastewater discharges originating from Seattle Barrel.

The 2013 monitoring results confirmed KCIW's belief that Seattle Barrel was likely discharging wastewater from the caustic tank to the sewer. Monitoring data collected from the upstream device showed consistently stable pH readings in the neutral range and generally ambient temperature. Conversely, monitoring data collected from the downstream device showed dramatic spikes in pH readings and corresponding rises in associated temperature readings.  One example of one of these events is graphically displayed below.  Results from the upstream device (monitoring wastewater in the system before the Seattle Barrel outflow) are shown on the right.  Results from the downstream device (monitoring wastewater added to the sewer system by Seattle Barrel) are shown on the left:

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 5

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



This example was not unique.  Data collected over three distinct extended monitoring periods revealed the same pattern. Following is a graph showing repeated spikes over March 2013 through June 2013 monitoring period:



Based on the 2013 sewer monitoring data, KCIW concluded that Seattle Barrel was discharging wastewater from its caustic tank to the sewer.

KCIW presented its findings to Louie Sanft.  Sanft did not challenge the data. He did, however, deny that the monitored discharges originated from the caustic tank.

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 6

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Instead, Sanft told KCIW that employees must have mistakenly released chemicals while servicing the company's boiler.  Sanft told inspectors that he had already remedied the problem by installing automated equipment to the boiler that would prevent the mistake from recurring.

KCIW investigated Louie Sanft's explanation that discharges associated with boiler servicing caused repeated discharges of caustic wastewater.  KCIW concluded that the boiler servicing theory could not explain the monitoring results for several reasons. First and foremost, routine pH readings of boiler water had never reached levels as high as the monitoring data collected from the sewer. Based on boiler servicing records, the pH of Seattle Barrel's boiler water was consistently measured at pH levels well below 12. None of the servicing records included levels the same or higher than those captured by the monitoring device installed by KCIW.

### E.    Compliance Order, Renewed Permit and Pretreatment System

In March 2014, KCIW assessed a $55,250 fine and issued a compliance order requiring Seattle Barrel to install a wastewater treatment system that would treat and sample all of Seattle Barrel's wastewater before it entered the sewer.  In response to an appeal from Louie Sanft, KCIW later reduced the fine in recognition of the expenses Seattle Barrel would incur in installing the wastewater system.

At approximately the same time, Seattle Barrel's 2009 Waste Discharge Permit came due for renewal.  KCIW added new provisions to the permit to address its heightened concern regarding Seattle Barrel's wastewater discharges. The new provisions were added in an effort to prevent future discharges of caustic wastewater to the sewer, including a condition explicitly prohibiting it from discharging the caustic solution, and a requirement that all wastewater discharges to the sewer be treated by an approved wastewater treatment system.  The permit stated that all of these discharges mu be continuously monitored for pH level.

Seattle Barrel installed the required wastewater treatment system in August 2016. Importantly, the wastewater system was not designed or constructed to treat the caustic

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 7

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

wastewater generated in the hot caustic tank. As noted, Seattle Barrel's permit expressly prohibited it from discharging the caustic tank wastewater to the sewer.  It was never intended to be treated onsite before being discharged to the sewer. Seattle Barrel confirmed this understanding in its 2014 permit application where it specifically stated that it was being collected and transported offsite by a licensed waste disposal company.

Seattle Barrel also installed and operated an evaporator for the limited purpose of treating and disposing of excess wastewater, predominantly rainwater.  But like the wastewater treatment system, the evaporator was not permitted to treat or dispose of the caustic wastewater.  Louie Sanft represented to the permitting agency (Puget Sound Clean Air Agency or PSCAA) that the evaporator would be used only for rainwater, and PSCAA regulations provided that the evaporator could only be used to dispose of liquid that was authorized to be discharged to the sewer.  Therefore, while Seattle Barrel installed additional wastewater equipment in 2016, none of that equipment was permitted, nor intended, to treat or dispose of the caustic wastewater.

In July 2015, KCIW reviewed Seattle Barrel's facility and plans as part of the approval process for the wastewater treatment system.  Inspectors identified multiple openings to the sewer that, they worried, Seattle Barrel could use to circumvent the requirement that all wastewater be treated and monitored.  KCIW required Seattle Barrel to permanently seal all of the identified openings except for the one to which the wastewater system was piped.  However, unbeknownst to KCIW, an additional drain was concealed in a dark corner behind the wastewater treatment system.  Below is a floor plan of the facility, with the hidden drain represented by a red box:

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 8

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Following installation of the wastewater treatment system, Louie Sanft represented to KCIW that Seattle Barrel had stopped discharging to the sewer altogether. Each month between September 2016 and February 2019, Louie Sanft submitted a self-monitoring report stating that Seattle Barrel had not discharged that month.

**F.      The 2017 Inspection and Referral to EPA**

In November 2017, KCIW conducted a routine inspection of Seattle Barrel. Louie Sanft and Dennis Leiva-Escoto were both present for the inspection. The KCIW inspector identified two areas of significant concern. First, the inspector observed two hoses leading from water tanks at the back of the Seattle Barrel facility to the railroad tracks that run behind Seattle Barrel's property. When the inspector saw the hoses, Leiva-Escoto quickly retrieved them from the train tracks. When questioned about the hoses, Louie Sanft denied having seen them, and claimed that it was not company practice to discharge wastewater to the train tracks.

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 9

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

During the same inspection, the inspector observed two full barrels of liquid, also in the back of the facility.  Leiva-Escoto told the inspector, in Louie Sanft's presence, that the barrels merely contained clean water.  However, when the barrels were opened, the barrels contained viscous liquid with a strong hydrocarbon smell.  Leiva-Escoto then admitted that the drums contained wastewater.  Again, Louie Sanft told the inspector that this was not company practice.  The November 2017 inspection, together with the prior compliance issues discussed above, prompted KCIW to refer Seattle Barrel's suspect waste handling practices to the Environmental Protection Agency Criminal Investigation Division ("EPA-CID") for further investigation.

**G.    The 2018 EPA Monitoring**

In 2018, EPA-CID conducted monitoring similar to the monitoring KCIW had conducted in 2013.  The monitoring took place over two periods, the first of which ran from April 15 through May 3.  An analysis of the monitoring data revealed the same pattern previously identified by KCIW, namely, periodic spikes of pH levels accompanied by spikes in temperature:



In reviewing this data, EPA-CID agents noticed a pattern. The elevated readings associated with the discharges typically occurred early in the morning.  In an effort to determine which Seattle Barrel employee(s) were at the facility when the elevated readings were recorded, agents conducted a second round of monitoring in September and October 2018.  This time, in addition to monitoring equipment placed in the sewer,

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 10

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

agents also installed surveillance cameras on utility poles outside of Seattle Barrel. The cameras were positioned to capture images of employees entering Seattle Barrel before the monitoring equipment captured the apparent discharges. Video footage showed that Dennis Leiva-Escoto was typically the first person to arrive at the facility in the morning. The recorded elevated readings from the monitoring device generally occurred shortly after his arrival. The footage also revealed that John Sanft was frequently—though not always—present during the discharges. Finally, the footage did not capture Louie Sanft entering the facility prior to the recorded elevated readings. Louie Sanft worked in an administrative office across the street and was not observed entering the facility until later in the afternoon.

## H.    The Search Warrant and Subject Interviews

In late February 2019, EPA-CID obtained a search warrant for the Seattle Barrel facility. In preparation for the warrant, agents installed real-time pH monitoring equipment outside the facility. Agents planned to catch Seattle Barrel in the act of discharging by executing the warrant when the pH temperature readings spiked.

On March 8, 2019, agents staged outside the facility early in the morning and remotely accessed the data stream from the monitoring device. At 6:19am, the pH level spiked from approximately 7 to over 12.0. Agents entered the facility and observed a portable pump and plastic hose lying on the ground near the caustic tank. Leiva-Escoto and several other employees were present. Leiva-Escoto declined to be interviewed and was taken into custody. EPA technicians took samples of wastewater in the caustic tank and the evaporator and performed other tests.

John Sanft and Louie Sanft participated in voluntary recorded interviews during execution of the search warrant. John Sanft initially told agents he had no knowledge of any illegal discharges from the facility. He also stated at least five times that he had no knowledge of any drains to the sewer located within the facility other than the single authorized discharge point attached to the wastewater treatment system. Later in the interview, however, John Sanft admitted to previously seeing Leiva-Escoto using a pump

1  and hose to discharge the wastewater from the caustic tank to a hidden drain. John Sanft

2  claimed he had only observed this on a "couple" of occasions. This claim was

3  inconsistent with surveillance video showing that John Sanft was present during at least

4  four discharge events during the September/October 2018 monitoring period alone. John

5  Sanft also claimed that, when he saw Leiva-Escoto discharging, he removed the hose

6  from the drain and told Leiva-Escoto that "we don't do that." Sanft eventually showed

7  the agents the hidden drain, which John Sanft referred to as "the illegal drain." A photo

8  of the drain taken on the day the warrant was executed is below:

9
10
11
12
13
14  
15
16
17
18
19
20

21      Louie Sanft similarly denied any knowledge of the hidden drain or unpermitted

22  discharges when initially contacted. When asked how many drains the facility had, he

23  responded that "there should be just one." He also initially stated that no one had ever

24  told him about unauthorized discharges of caustic wastewater to the sewer. Louie Sanft

25  stated that, if he had been so informed, he would "go crazy," and that "you wouldn't have

26  gotten a reading this morning." When asked how Seattle Barrel disposed of caustic

27  wastewater from the caustic tank, he told agents that Leiva-Escoto would evaporate the

28

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 12

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  wastewater from the caustic tank.  John Sanft described the practice by analogizing it to a
2  tea kettle left on the stove until all the water evaporates.

3       Three hours after concluding his initial interview, Louie Sanft told agents he
4  wanted to clarify his prior statement.  Contrary to his initial denial, Louie Sanft said two
5  people had previously told him about the illegal discharges—John Sanft, and a former
6  employee whose name Louie Sanft could not recall.  Louie Sanft said that, after hearing
7  these reports, he told Leiva-Escoto that "there better not be anything going to the sewer."
8  Louie Sanft said that Leiva-Escoto told Louie Sanft he had not been discharging, and that
9  "I took him at his word."

10  **I.      Cooperation of Dennis Leiva-Escoto**

11       In advance of the search warrant, agents had obtained a material witness arrest
12  warrant for Dennis Leiva-Escoto.  Leiva-Escoto is an undocumented Honduran national.
13  Based on his apparent knowledge of, and participation in, the alleged illegal discharges,
14  agents were concerned that Leiva-Escoto might flee or be removed from the country by
15  immigration officials and be unavailable to testify at future proceedings.  To preserve
16  Leiva-Escoto's availability, EPA-CID obtained a deferral of removal proceedings for
17  Leiva-Escoto that allows him to remain and work in this country while this matter is
18  pending.  The government has made no promises or other agreements with Leiva-Escoto
19  about his immigration status after this matter is resolved.

20       Leiva-Escoto agreed to cooperate with the government.  He has provided
21  interviews in which he admitted that he repeatedly discharged wastewater from the
22  caustic tank to the sewer by pumping it to the hidden drain.  Leiva-Escoto stated that
23  Louie Sanft told Leiva-Escoto to dispose of the caustic tank in this manner and said to do
24  so when Louie Sanft was not present.  Leiva-Escoto also stated that John Sanft was fully
25  aware of the discharges.

26  **J.      Testimony of Mark Henderson**

27       Following the search, the government interviewed Mark Henderson, a former
28  Seattle Barrel employee.  Henderson briefly worked as a manager at Seattle Barrel in

August and September 2017.  Henderson will testify that, in September 2017, he observed Dennis Leiva-Escoto pumping the caustic tank wastewater into the hidden drain.  Henderson immediately told Louie Sanft what he had seen.  Louie Sanft did not express surprise, and responded "oh yeah, that's an old drain."  Henderson followed up the next day by taking Louie Sanft to the hidden drain and describing exactly what he had seen.  Henderson observed that a small cap, apparently made of duct tape, had recently been placed over the drain.  Louie Sanft made clear to Henderson that he did not want to discuss the matter further.  Henderson left the company shortly after this incident.

## III.    CHARGES AND RELEVANT LAW

### A.    The Clean Water Act

The Federal Water Pollution Control Act (Clean Water Act), Title 33, United States Code, Section 1251, et seq., was enacted to restore and maintain the chemical, physical, and biological integrity of the nation's waters.  Among other things, the Clean Water Act requires the United States Environmental Protection Agency (EPA) to establish standards governing the introduction of pollutants generated by industrial (non-domestic) users, such as the defendants in this case, to publicly owned treatment works (POTWs), to prevent pollutants from passing through, or interfering with the operation of, such treatment works.  33 U.S.C. § 1317(b).  The term "pretreatment" refers to the reduction, elimination, or alteration in the nature of the pollutant content of wastewater prior to the discharge of such wastewater to a POTW.  40 C.F.R. § 403.3(s).

EPA authorizes states to implement permitting and oversight programs mandated by the Clean Water Act, including pretreatment programs, although federal enforcement authority is retained.  33 U.S.C. § 1342(b).  In 1981, the EPA approved King County's municipal wastewater system pursuant to the Clean Water Act.  Dkt. 78 Ex. A.  On November 12, 2021, the Court took judicial notice of the fact that King County operates a pretreatment program approved by the EPA under the Clean Water Act.  Dkt. 108 at 4.

The felony criminal provisions of the Clean Water Act are set forth in 33 U.S.C. § 1319(c).  Subsection 1319(c)(2) lists several substantive statutory provisions, the

1   violation of which triggers criminal liability.  The defendants in this case are charged

2   with knowingly violating section 1319(c)(2)(A), which prohibits the knowing violation of

3   any requirement imposed in a pretreatment program approved by EPA under the Clean

4   Water Act.

5   **B.    Charges**

6       **1.    Count 1:  Conspiracy**

7          Count 1 charges the defendants with conspiracy in violation of 18 U.S.C. § 371.

8   Count 1 alleges that Louie Sanft, John Sanft, Seattle Barrel, and others (to include Dennis

9   Leiva-Escoto) conspired to (1) violate the Clean Water Act; (2) make false statements in

10  documents required to be filed under the Clean Water Act (Seattle Barrel's monthly self-

11  monitoring reports); (3) conceal material information from the EPA in violation of 18

12  U.S.C. § 1001; and (4) defraud the United States.

13         To establish a violation of 18 U.S.C. § 371, the government must prove beyond a

14  reasonable doubt that: (1) there was an agreement between two or more persons to

15  commit a crime; (2) the defendant became a member of the conspiracy knowing of its

16  object and intending to help accomplish it; and (3) one of the members of the conspiracy

17  performed at least one overt act for the purpose of carrying out the conspiracy.  *United*

18  *States v. Garza*, 980 F.2d 546, 552 (9th Cir. 1992); *see also* Ninth Circuit Model Jury

19  Instruction 8.20.

20         The agreement to accomplish an illegal object need not be a formal agreement.  It

21  is sufficient to show that the conspirators came to a mutual understanding to accomplish

22  an unlawful purpose.  *United States v. Kiriki*, 756 F.2d 1449, 1453-55 (9th Cir. 1985).  In

23  addition, the government need not produce direct evidence of the agreement.  Instead, an

24  agreement constituting a conspiracy may be inferred from the acts of the parties.  *United*

25  *States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997).  Thus, one means of proving a

26  conspiracy is by showing that the conspirators acted together to achieve a common goal.

27  *United States v. Mesa-Farias*, 53 F.3d 258, 260 (9th Cir. 1995).

28

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 15

2.      **Counts 2-30:  Violations of the Clean Water Act**

Counts 2-30 charge the defendants with substantive violations of the Clean Water Act in violation of 33 U.S.C. § 1319(c)(2)(A).  Each count is based on a discharge in 2018 or 2019 that was identified by EPA's covert monitoring over those periods.  The elements of this violation are:  (1) the defendant discharged, or caused to be discharged, a pollutant; (2) the pollutant was discharged into a POTW; (3) the discharge violated one or more requirements or prohibitions of an approved pretreatment program in effect at that time; and (4) the defendant acted knowingly.  33 U.S.C. § 1319(c)(2)(A).

The evidence will prove that defendants' discharges on the charged dates violated Seattle Barrel's wastewater discharge permit in at least three respects.  First, the pH level of the discharges exceeded 12.0, violating the permit condition prohibiting discharges in excess of 12.0.  Second, the discharges violated the special permit condition prohibiting Seattle Barrel from discharging the caustic drum/barrel wash solution to the sewer system.  And third, because the charged discharges were made through the hidden drain, and not routed through the wastewater treatment system, they violated the special permit condition requiring that waste streams be routed through the approved wastewater treatment system before being discharged to the sewer system.

3.      **Counts 31-34:  Submission of False Clean Water Act Certifications**

Counts 31-34 charge defendants with submitting false statements in documents required under the Clean Water Act.  The elements of this offense are:  (1) the defendant knowingly made or caused to be made a false statement, representation, or certification; (2) the statement, representation or certification was made or caused to be made in a document required to be filed under the Clean Water Act; (3) the statement, representation or certification was material; and (4) the defendant knew the statement, representation or certification was false.  33 U.S.C. § 1319(c)(4).  The government does not need to establish that the statement actually influenced agency or that the agency in fact relied on the statement.  *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998).

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 16

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Each of these counts is based on a self-monitoring report prepared and signed by

2    Louie Sanft.  The self-monitoring reports are expressly required in Section S4. of Seattle

3    Barrel's permit.   In each charged instance, Louie Sanft certified that Seattle Barrel had

4    not discharged to the sewer at all during the month in question.  This certification was

5    false.  The evidence will establish that Seattle Barrel in fact made numerous unauthorized

6    discharges of caustic wastewater to the sewer during each of these months, and that Louie

7    Sanft was aware of this practice.

8         **4.     Counts 35 and 36:  False Statements to the United States**

9    Counts 35 and 36 charge the defendants with making false statements in violation

10   of 18 U.S.C. § 1001.  The elements of this offense are:  (1) the defendant made a false

11   statement in a matter within the jurisdiction of the United States; (2) the defendant acted

12   knowingly and willfully, that is, voluntarily and purposefully, and with knowledge that

13   his or her conduct was, in a general sense, unlawful; and (3) the statement was material to

14   the activities or decisions of the United States, that is, it had a natural tendency to

15   influence, or was capable of influencing, the agency's decisions or activities.  Ninth

16   Circuit Model Jury Instruction 8.73.

17   Count 35 names both Louie Sanft and Seattle Barrel as defendants.  This charge is

18   based on statements by Louie Sanft during his interview in which he claimed that Seattle

19   Barrel disposed of the caustic solution by evaporating it from the caustic tank, when in

20   fact Seattle Barrel discharged the wastewater to the sewer through the hidden drain.

21   Count 36 names Seattle Barrel.  This charge alleges that John Sanft falsely stated

22   that he was not aware of any open drains leading from the Seattle Barrel facility to the

23   sewer.  After repeatedly making this statement, John Sanft later admitted that he in fact

24   knew about the hidden drain.  It is well established, however, that recantation is not a

25   defense to a Section 1001 charge.  *United States v. Sala-Camacho*, 859 F.2d 788, 792

26   (9th Cir. 1988) (recantation not a defense to Section 1001 charge); *United States v.*

27   *Beaver*, 515 F.3d 730, 742-743 (7th Cir. 2008) (noting that section 1001 contains "no

28

recantation clause").  The government's proposed jury instructions address this point of law.

## C.     Corporate Liability

Seattle Barrel is criminally responsible for the acts of its employees, and therefore may be convicted for the unlawful conduct of Louie Sanft, John Sanft, or Dennis Leiva-Escoto.  The Ninth Circuit has long recognized that corporations may be held criminally liable for the acts or omissions of their agents.  *United States v. Beusch*, 596 F.2d 871, 877 (9th Cir. 1979) (citing cases); *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004 (9th Cir. 1972) (citing cases).  Imposing such liability serves to control the acts of employees exercising delegated authority and allows for effectual enforcement of the law.  *New York Cent. & H.R.R. Co. v. United States*, 212 U.S. 481, 493-94 (1909).

For a corporation to be criminally liable, its agent must have acted, at least in part, to benefit the corporation, "thus bringing his acts within the scope of his employment." *Beusch*, 596 F.2d at 877.  The corporation may be liable even when the employee's acts are contrary to express instructions and policies.  *Beusch*, 596 F.2d at 877-78 (affirming instruction stating that "a corporation may be responsible for the acts of its agents done or made within the scope of authority, even though the agent's conduct may be contrary to the corporation's actual instructions or contrary to the corporation's stated policies"); *Hilton Hotels Corp.*, 467 F.2d at 1004, 1007 (affirming similar instruction and stating that company's policy statement against engaging in the charged conduct was "no defense").  The government has proposed an instruction incorporating these principles.

## D.     *Mens Rea* and Derivative Liability

As the Court noted in granting the government's motion in *limine*, the Clean Water Act is a general intent statute that requires only that the defendant knew the factual bases of the violations.  Dkt. 109.  In addition, the jury may find that Louie Sanft acted knowingly based either on a deliberate ignorance/willful blindness theory, or as a responsible corporate officer.  Both are more fully discussed below, together with *Pinkerton* liability and aiding and abetting.

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 18

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    The government is entitled to argue criminal liability based on alternative theories.

2    Similarly, the jury is not foreclosed from finding criminal liability based on multiple

3    theories. The alternative theories discussed below relieve the government of having to

4    prove the defendant personally discharged, or personally caused the discharge, of the

5    caustic wastewater in violation of the permit.

6    **1.      Deliberate Ignorance/Willful Blindness**

7    The government's proposed deliberate ignorance instruction is tailored to the

8    knowledge element of the Clean Water Act counts.  Under the instruction, the

9    government can establish knowledge by showing the defendant "closed his eyes to

10   obvious facts or failed to investigate when aware of facts which demanded investigation."

11   *United States v. Buckley*, 934 F.2d 84, 88 (6th Cir. 1991).  This type of "willful

12   blindness" jury instruction is sometimes referred to as an "ostrich" or "Jewell

13   instruction," after the seminal Ninth Circuit opinion discussing the matter, *United States*

14   *v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976).

15   The Ninth Circuit addressed use of the "willful blindness" or "deliberate

16   ignorance" instruction again in *United States v. Heredia*, 483 F.3d 913, 924 (9th Cir.

17   2007).  In addition to re-affirming its prior decision in *Jewell*, the court in *Heredia*

18   overruled those cases stating that a "deliberate ignorance" instruction should be "rarely"

19   given.  Finding such speculation to be "misguided," the court placed no limitations on a

20   district court's decision to use a deliberate ignorance instruction.  *Id.* at 924, n.16.  The

21   Ninth Circuit again affirmed use of the instruction in *United States v. Yi*, 704 F.3d 800,

22   804 (9th Cir. 2013), an environmental crimes prosecution brought under the Clean Air

23   Act.  The court specifically affirmed use of the circuit's model instruction.  *Id.*

24   Prosecutors have successfully proven knowledge through evidence of "willful

25   blindness" or "deliberate ignorance" in a variety of environmental contexts.  In *United*

26   *States v. Williams*, the Sixth Circuit upheld a jury instruction permitting the jury to find

27   the defendant had the requisite state of mind if "he was aware of a high probability that

28   waste with the potential to be harmful to others or to the environment was stored and

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 19

1   disposed at [the facility], and that the defendant deliberately closed his eyes to what was

2   obvious."  195 F.3d 823, 825–26 (6th Cir. 1999); *see also United States v. Lee*, 991 F.2d

3   343, 349–51 (6th Cir. 1993) ("No one can avoid responsibility for a crime by deliberately

4   ignoring the obvious.").

5       Nothing prevents the government from presenting evidence and offering argument

6   to establish actual knowledge, while still asking the court for a willful blindness

7   instruction.  *See United States v. Hopkins*, 53 F.3d 533, 541–42 (2d Cir. 1995) (holding

8   that a conscious avoidance jury instruction "is not inappropriate merely because the

9   government has primarily attempted to prove that the defendant had actual knowledge").

10  The government will present evidence of Louis Sanft's actual knowledge of the

11  unauthorized discharges of the caustic wastewater to the sewer, including direct

12  statements made by Louis Sanft and others.  While these facts alone support finding the

13  defendants possessed the requisite actual knowledge necessary to sustain convictions on

14  the Clean Water Act counts, those same facts also support a scenario from which the jury

15  could find that Louis Sanft was aware of a high probability wastewater from the caustic

16  tank was pumped into the unauthorized discharge, and he deliberately closed his eyes to

17  the obvious.

18      **2.      Responsible Corporate Officer Doctrine**

19      The government has also requested that the court instruct the jury on application

20  of the responsible corporate officer doctrine.  See Government's Proposed Instruction

21  No. 25.  Simply put, this doctrine means that a corporate officer like Louie Sanft is

22  responsible for crimes committed by his company if he was aware of the unlawful

23  conduct and had the authority to prevent it but failed to do so.  Responsible corporate

24  officer liability is grounded in the text of the CWA and supported by ample authority.

25      The Supreme Court first recognized the responsible corporate officer doctrine in

26  *United States v. Dotterweich*, where the Court upheld conviction of the president and

27  general manager of a drug company, holding that "[t]he offense is committed . . . by all

28  who do have such a responsible share in the furtherance" of the illegal transaction. 320

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 20

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    U.S. 277, 284 (1943); *see also Carolene Products Co. v. United States*, 140 F.2d 61, 66

2    (4th Cir.) ("There is ample authority in support of the principle that the directing heads of

3    a corporation which is engaged in an unlawful business may be held criminally liable for

4    the acts of subordinates done in the normal course of business, regardless of whether or

5    not these directing heads personally supervised the particular acts done or were

6    personally present at the time and place of commission of these acts."), *aff'd on other*

7    *grounds*, 323 U.S. 18 (1944).

8         The Supreme Court reaffirmed the doctrine in *United States v. Park*, 421 U.S. 658,

9    668 (1975).  In *Park*, the Court rejected a corporate president defendant's argument that

10   he could not be considered a responsible corporate officer because he had delegated

11   decision-making control to a subordinate.  *Id.* at 677. The Court stated that the

12   government makes a prima facie case by introducing evidence sufficient to warrant a

13   finding by the trier of the fact that the defendant had, by reason of his position in the

14   corporation, responsibility, and authority either to prevent in the first instance or

15   promptly to correct, the violation complained of, and he failed to do so.  *Id.* at 673-74.

16        The criminal provisions of the Clean Water Act (CWA) explicitly authorize

17   liability for responsible corporate officers. The CWA makes criminally liable "any person

18   who... knowingly violates" its provisions.  33 U.S.C. § 1319(c)(2).  The CWA defines

19   "person" to include "any responsible corporate officer." 33 U.S.C. § 1319(c)(6).

20        The Ninth Circuit held that the responsible corporate officer doctrine was properly

21   given in a pretreatment case similar to this one that was tried in this district.  *United*

22   *States v. Iverson*, 162 F.3d 1015 (9th Cir. 1998).  The trial court had instructed the jury

23   could that it could find the defendant liable under the CWA if it found, beyond a

24   reasonable doubt that the defendant: (1) had knowledge of the fact that pollutants were

25   being discharged to the sewer system by employees of [the business]; (2) had the

26   authority and capacity to prevent the discharge of pollutants to the sewer system; and (3)

27   failed to prevent the ongoing discharge of pollutants to the sewer system.  *Id.* at 1022.

28   Rejecting the defendant's challenge to the instruction, the Ninth Circuit cited the phrase

requiring the government to prove the defendant had the "authority and capacity to prevent the discharge of pollutants to the sewer system." By requiring the jury to find the defendant had both the authority and capacity to prevent the discharges, the district court ensured that the jury could convict the defendant only if he had actual authority to exercise control over the criminal activity. *Id*. at 1025.

In addition to the *Iverson,* the responsible corporate officer instruction has been given in several other Clean Water Act prosecutions, including *United States v. Dooley*, CR11-252MJP in this district. *See United States v. Kuhn*, 99-CR-20060-BC (E.D. Mich.) *rev'd* on other grounds, 345 F.3d 431 (6th Cir. 2003); *United States v. Venetian Harbor, Inc.*, No. S4:01CR107 CAS (LOD) (E.D. Mo.), *rev'd* on other grounds, *United States v. Templeton*, 2:07-cr-20037-VAR-MKM , 378 F.3d 845 (8th Cir. 2004); *United States v. Frezzo*, 602 F.3d 1123, 1130 n.11 (3d Cir. 1979).

### 3.    *Pinkerton* Liability

Louie Sanft is responsible for the acts of his co-conspirators under *United States v. Pinkerton*, 328 U.S. 640, 647-48 (1946). *See also United States v. Petti*, 973 F.2d 1441, 1446 (9th Cir. 1992). Under *Pinkerton*, conspirators are criminally liable for all substantive crimes committed by their co-conspirators in furtherance of the conspiracy if the substantive crimes are "within the scope of the unlawful project" and are foreseeable to the defendant. *Id*. The government is proposing Ninth Circuit Model Jury Instruction 8.25, which incorporates these principles.

### 4.    Aiding and Abetting Liability

Finally, Louie Sanft may be held liable as an aider and abettor under 18 U.S.C. § 2. Under Section 2(a), a defendant who has not committed the acts constituting the crime may be found guilty of the crime if he or she "aids, abets, counsels, commands, induces or procures" an offense against the United States. "An aider and abetter is a person who knowingly and intentionally helps another to commit a crime." *United States v. Cruz Ventura*, 979 F.2d 146, 149 (9th Cir. 1992). The government does not need to prove which defendant actually committed the unlawful act, and which

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 22

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  defendant aided and abetted.  The government has submitted Ninth Circuit Model
2  Instruction 5.1, which addresses this issue.

## IV.    EVIDENTIARY ISSUES

**A.    Hearsay Issues**

### 1.    Statements of Co-conspirator John Sanft

The government intends to offer statements made by John Sanft.  These include statements he made to KCIW investigators during KCIW's oversight of Seattle Barrel during the years before the criminal investigation, together with recorded statements he made during execution of the search warrant.

The admissibility of John Sanft's statements has been briefed extensively elsewhere.  *See* Dkt. 96 (Response to Motion to Exclude Co-Conspirator Statements); Dkt. 97 (Response to Motion to Exclude Statements of John Sanft).  As explained in those pleadings, John Sanft's statements are admissible for several reasons.  First, all of John Sanft's statements are admissible against Seattle Barrel as statements of an agent of a party opponent.  Fed. R. Evid. 801(d)(2)(D).  The government intends to offer such admissions in this case.  These admissions will be drawn from contacts with employees, conversations with federal investigators, and regulatory personnel and investigators.  Such statements are admissible in a criminal case.  *White v. United States*, 479 U.S. 889 (1986); *United States v. Jenkins*, 785 F.2d 1387, 1393 (9th Cir. 1986).  Conversely, statements offered by the defendant for the truth of the matters asserted are not admissible over a hearsay objection.  Fed. R. Evid. 801(d)(2).  A defendant is not entitled to elicit exculpatory testimony on cross-examination to avoid testifying even where the government previously elicits inculpatory testimony using defendant's own statements.  *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

Second, statements of John Sanft made in furtherance of the conspiracy (for example, statements intended to mislead KCIW investigators or federal agents) are admissible as statements of a co-conspirator.  Fed. R. Evid. 801(d)(2)(E).  Finally,

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 23

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    statements of John Sanft offered for their falsity are admissible because they are not

2    offered to prove the truth of the matter asserted.  *Crawford v. Washington*, 541 U.S. 36,

3    60 n.9 (2004); *United States v. Fried*, 576 F2d 787, 793 (9th Cir. 1978).

4            As previously briefed by the parties, a narrow category of John Sanft's statements

5    cannot be offered for their truth if they "facially," "directly," and "powerfully"

6    incriminate Louie Sanft.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Bruton v.*

7    *United States,* 391 U.S. 123 (1968).  The United States has agreed to redact the

8    statements meeting this standard, specifically, statements that (1) John Sanft told Louie

9    Sanft about the discharges; (2) Louie Sanft knew what Dennis did with the caustic

10   solution; and (3) Louie Sanft was responsible for hiring a contractor to permanently seal

11   the hidden drain.

12           **2.      Public Records**

13           The government will offer various public records, including records maintained by

14   KCIW.  These records are admissible both as records of regularly-conducted activity

15   under Rule 803(6), and under the public records exception to the hearsay rule, which

16   provides for the admission of:

17           A record or statement of a public office if it sets out (i) the office's
             activities; or (ii) a matter observed while under a legal duty to report, but
18           not including, in a criminal case, a matter observed by law-enforcement
19           personnel.

20   Fed. R. Evid. 803(8)(A).

21           Any person familiar with the record-keeping practices of the business capable of

22   identifying the record at issue as having been made in the ordinary course of business is a

23   sufficient foundation witness.  Personal knowledge of the document is not required and

24   does not affect its admissibility.  *United States v. Pitman*, 475 F.2d 1335, 1337 (9th Cir.

25   1973).

26           In this case, the government will offer records maintained by agencies charged

27   with addressing the issues arising from Seattle Barrel's waste handling activities.  These

28   documents were prepared by a public agency dealing with official activities of the agency

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 24

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   necessary for the performance of its duties.  They are admissible pursuant to Fed. R.

2   Evid. 803(8), and 803(6).  Courts have repeatedly held that the public records exception

3   extends to reports of government inspections, such as those conducted by KCIW.  *United*

4   *States v. Hansen*, 583 F.2d 325, 333 (7th Cir. 1978) (city building inspector's report

5   admissible as public record); *United States v. Holmes*, 2021 WL 2044479 at *9 (N.D.

6   Cal. May 22, 2021) (FDA inspection report admissible as public record); *United States v.*

7   *Stabl, Inc.*, 2013 WL 2250279 at *5 (D. Neb. May 21, 2013) (EPA inspection report and

8   compliance order admissible as public records).

9        A matter is observed while under a legal duty to report if "the record at issue is

10   appropriate to the function of the relevant government office, given the nature of the

11   responsibilities assigned to that office."  *United States v. Fryberg*, 854 F.3d 1126, 1131

12   (9th Cir. 2017).  Public records created in the agency's usual course of business are not

13   testimonial.  *See United States v. Berry*, 683 F.3d 1015, 1023 (9th Cir. 2012) (agency

14   records nontestimonial if they were "created for the administration of an entity's affairs

15   and not for the purpose of proving some fact at trial"); *Fryberg,* 854 F.3d at 1134 (public

16   records not subject to Confrontation Clause unless the "primary purpose" of the record is

17   testimonial).

18        Public records are self-authenticating and do not require testimony of a live

19   witness when either: (1) presented with a certification from a custodian of records

20   pursuant to Rule 902(11); or (2) certified as correct by an official.  Fed. R. Evid. 902(4).

21   If offered through a live witness, the person authenticating the documents need not have

22   personal knowledge of the documents if he or she is familiar with the record-keeping

23   system in which they were kept.  *United States v. Central Gulf Lines*, 747 F.2d 315, 320

24   (5th Cir. 1984).

25        **3.**    **Business Records and Rule 902 Certifications**

26        The government will offer records of regularly conducted activities of businesses.

27   For example, the government will offer business records from Emerald Services, the

28   waste disposal company that contracted with Seattle Barrel to transport and dispose of

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 25

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    industrial wastes.  These records are admissible pursuant to Rule 803(6), which allows

2    for admission of a record if it is made at or near the time of the events set forth therein,

3    by a person with knowledge, and is kept during regularly conducted activity of a business

4    or other organization, and it is the regular practice of the organization to make the record.

5    Fed. R. Evid. 803(6).  Incompleteness, ambiguities, and inaccuracies in records go to the

6    weight to be given the evidence, not to its admissibility.  *United States v. Catabran*, 836

7    F.2d 453, 458 (9th Cir. 1988).

8         Any person familiar with the record-keeping practices of the business is a

9    sufficient foundational witness.  Personal knowledge of the document is not required and

10   does not affect its admissibility.  *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir.

11   1993) (the phrase "other qualified witness" is broadly interpreted to require "only that the

12   witness understand the record-keeping system" at the organization).  Furthermore, a

13   record generated by a third party and received and relied upon in the ordinary course,

14   such as an invoice, becomes a business record of the company relying upon it.  *Id.*, 5 F.3d

15   at 1333-34; *see United States v. Jawara*, 474 F.3d 565, 585 (9th Cir. 2007) ("[W]e would

16   have no trouble concluding that a college in the United States was a proper custodian of

17   its' students' SAT results, even though the SAT results were actually prepared by another

18   entity"); *United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992).

19        The government need not show the records are accurate; it only needs to show the

20   records are kept in a regular manner and are relied upon for the management and

21   operation of the business.  *Johnson v. United States*, 325 F.2d 709, 711 (1st Cir. 1963).

22   Incompleteness, ambiguities, and inaccuracies in records go to weight, not admissibility.

23   *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988); *United States v. Hudson*,

24   479 F.2d 251, 254 (9th Cir. 1972).  In determining whether these foundational facts have

25   been established, the court may consider hearsay and other evidence not admissible at

26   trial.  Fed. R. Evid. 104(a).

27        In some cases, the government may authenticate business records by offering Rule

28   of Evidence 902(11) certifications rather than live testimony.  Rule 902(11) provides that

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 26

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a party may authenticate a business record through a signed certification of a records custodian if the proponent of the evidence gives the adverse party adequate notice of its intent to offer the record.  The government has provided all 902(11) certifications to the defense.

## B.    Issues Pertaining to Recorded Interviews

Defendants Louie Sanft and John Sanft both consented to recorded interviews on March 8, 2019 during execution of the search warrant.  The government intends to offer excerpts of the recordings. Those excerpts were disclosed to the defense on February 12, 2021.

A recording excerpt is admissible provided it is not misleading.  An adverse party can request additional portions of a written or recorded statement if the additional portion is necessary in the interest of fairness. Fed. R. Evid. 106.  The rule seeks to avoid the unfairness inherent in "the misleading impression created by taking matters out of context." Fed. R. Evid. 106 Adv. Comm. Note.  Rule 106, however, does not automatically require introducing the entirety of a recording or writing.  Rather, the rule applies only to the extent necessary to avoid taking the statement out of context.  *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (Rule 106 "does not, however, require the introduction of any unedited writing or statement merely because an adverse party has introduced an edited version"); *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014) (trial court "correctly determined that those statements were neither misleading nor taken out of context" therefore Rule 106 did not require introduction of remainder); *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) ("it is often perfectly proper to admit segments of prior testimony without including everything, and adverse parties are not entitled to offer additional segments just because they are there and the proponent has not offered them."); *United States v. Dorrell*, 758 F.2d 427, 434-35 (9th Cir. 1985) (Rule 106 inapplicable where segment did not "create a misleading impression by taking matters out of context").

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 27

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The government plans to display transcripts of the interviews while the audio recordings are playing.  The transcripts were prepared by the defense and have been synchronized with the audio recordings.  The Ninth Circuit has approved use of transcripts of properly authenticated recordings to aid the jury in understanding the recordings.  *United States v. Turner*, 528 F.2d 143, 167-68 (9th Cir. 1975).  While the transcripts should not be sent back to the jury room, they may be provided to the jury if the jury requests to have the tapes replayed during deliberations.  Because the jury is instructed that the recordings control, the court is not required to review the transcripts to determine their accuracy.  *United States v. Tisor*, 96 F.3d 370, 377 (9th Cir. 1996).

## C.    Expert Testimony

The government notified defense counsel of its intent to offer expert witness testimony from Dr. Joe Lowry and Blake Stapper. Written reports authored by both were provided.  The government has also provided notice that many of the government's fact witness (such as KCIW investigators) also have specialized knowledge that they may discuss during their testimony.

Dr. Lowry is an environmental chemist who currently serves as Chief Scientist and National Technical Expert for the EPA's National Enforcement Investigations Center located in Denver, Colorado.  Dr. Lowry has examined the sampling and monitoring data collected by KCIW and EPA, as well as the samples collected by EPA from Seattle Barrel during the execution of the search warrant.  Dr. Lowry's anticipated testimony is discussed in detail in his 44-page report, which was previously filed with the Court.  Dkt. 82 Ex. A.  Dr. Lowry will testify, for example, that the attributes of Seattle Barrel's discharges, as shown in the sampling and monitoring data, are consistent with samples taken from the caustic tank at various points in time.  On November 13, 2021, the Court denied defendants' motion to exclude certain opinions of Dr. Lowry or for a *Daubert* hearing, and found that Dr. Lowry's methodology and opinions are "both relevant and reliable."  Dkt. 110 at 4.

Blake Stapper is a professional engineer with special expertise in heat transfer systems.  Mr. Stapper will address the claim made by Louie Sanft that Seattle Barrel disposed of its caustic solution by evaporating it from the caustic tank.

**D.  Photographs and Diagrams**

The government will offer photographs of Seattle Barrel's facility and equipment. These exhibits are admissible pursuant to Rule 901 if a witness with knowledge testifies that the photograph is an accurate representation of what it is intended to depict.  *United States v. Brannon*, 616 F.2d 413, 416 (9th Cir. 1980) (evidence that photographs accurately depict scene provides a sufficient foundation for admission under Rule 901(a)).

The government will also offer diagrams of the Seattle Barrel facility, as well as key components of the facility.  For example, the government will offer the floor plan reproduced above, as well as a diagram of the caustic tank's heating mechanism.  Like photographs, diagrams are admissible in evidence if a witness testifies that the diagram is accurate.  *United States v. Jordano*, 521 F.2d 695, 698 (2d Cir. 1975).

**E.  Summary Exhibits**

The government intends to offer into evidence summary exhibits prepared using voluminous records maintained either by the defendants or generated by public regulatory and investigative agencies.  Federal Rule of Evidence 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

"The purpose of the rule is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury."  *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985), cited in *United States v. Rizk*,

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 29

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

660 F.3d 1125, 1130 (9th Cir. 2011).  As noted by the court in *Rizk*, proponents of summary evidence "must establish that the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection."  *Id.*, citing *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996).  While the underlying materials must be admissible, they need not be admitted into evidence. *Id.*, citing *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988).

**F.     The Defense May Not Use Interview Memos for Impeachment Purposes.**

Defense counsel should not be allowed to use government interview memos for impeachment purposes.  When questioning witnesses, counsel often read from interview memos or otherwise use the memos to imply the witness made an inconsistent statement on a specific day.  While it is permissible for counsel to ask witnesses *if* they made certain prior statements, counsel should not be permitted to use the interview memos to suggest that there is evidence the witnesses did so.

Witnesses may only be impeached with their own prior statements.  Law enforcement interview summaries are not the statements of the witnesses themselves. The Supreme Court has recognized that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations."  *Palermo v. United States*, 360 U.S. 343, 350 (1959).

When taking notes and preparing interview memoranda, investigating agents necessarily exercise discretion by including their characterization of only those segments of a witness's interview to which the agents assign importance and relevance.  As a result, the notes and written reports are not the "statements" of the interviewee.  *See United States v. Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985) ("The 302 summaries of interviews conducted by [g]overnment agents with [the] witness . . . cannot fall within subsection (1) of 18 U.S.C. § 3500(e) because [the witness] did not draft the summaries or otherwise approve their contents."); *United States v. Donato*, 99 F.3d 426, 433 (D.C.

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 30

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Cir. 1997) (under *Palermo*, FBI notes and 302s that constitute a selection of what was said during the interview are not statements of interviewees that would be discoverable under the Jencks Act).

As a result, courts have held that law enforcement summaries cannot be used to impeach interviewees if they are called as witnesses at trial. *See, e.g.*, *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (upholding trial court's refusal to admit FBI agent's summary of interview with government witness as a prior inconsistent statement because document was "not attributable to" the witness); *United States v. Shannahan*, 605 F.2d 539, 542 (10th Cir. 1979) (upholding refusal of trial court to permit defense to use FBI report of interview to impeach government witnesses because reports "were not signed or otherwise adopted or approved, by the witness" and therefore "did not come within the rule authorizing the use of prior statements"); *United States v. Kot*, No. 2:10-CR-00280-KJD-GWF, 2012 WL 1657118, at *2 (D. Nev. May 10, 2012), *aff'd*, 583 F. App'x 716 (9th Cir. 2014) (precluding the defense from using FBI reports of interviews to impeach government witnesses or suggesting to the jury that the FBI report was the statement of the witness).

## G.    Exclusion of Witnesses

Pursuant to Rule 615 of the Federal Rules of Evidence, the government respectfully requests that witnesses be excluded from the courtroom prior to their testimony, except for the lead case agent, EPA-CID Special Agent Eric Goetz.  *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987) (case agent permitted to remain in court through trial as a representative of the government); *see also United States v. Machor*, 879 F.2d 945, 953-54 (1st Cir. 1989) (same).

//

//

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 31

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## V.   CONCLUSION

This Trial Brief is intended to familiarize the Court with the government's case and evidentiary issues related to the trial presentation.  The government will supplement this brief as necessary if additional issues arise.

DATED:  November 16, 2021.

Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

/s/ Seth Wilkinson
SETH WILKINSON
JAMES D. OESTERLE,
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271

UNITED STATES v. SANFT, CR19-258RAJ
TRIAL BRIEF - 32

UNITED STATES ATTORNEY
700 STEWART STREET, STE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970