HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

LOUIE SANFT, JOHN SANFT, and
SEATTLE BARREL AND COOPERAGE
COMPANY

        Defendants.

Case No. CR 19-00258 RAJ

ORDER

## I.    INTRODUCTION

This matter comes before the Court on Defendant Louie Sanft's ("Louie Sanft" or "Sanft") Rule 33 Motion for a New Trial (Dkt. # 263), Defendant Seattle Barrel and Cooperage Company's ("Seattle Barrel") Rule 33 Motion for New Trial and Joinder (Dkt. # 267), Louie Sanft's Motion for a New Trial on Count 35 (Dkt. # 265), Seattle Barrel's Motion for a New Trial on Count 35 (Dkt. # 268), and Defendants' Joint Motion to Dismiss or for a New Trial and An Evidentiary Hearing (Dkt. # 311). The Government opposes each motion (Dkt. ## 271, 272, 273, 329), and Defendants have submitted

ORDER – 1

replies (Dkt. ## 275, 276, 277, 278, 279, 343). Having reviewed the briefing, relevant record, and applicable law, the Court finds that oral argument is unnecessary. For the reasons below, the Court **DENIES** Defendants' motions.

## II.     PROCEDURAL HISTORY

Following a two week-long jury trial and three hours of deliberation, on December 21, 2021, Mr. Sanft and Seattle Barrel, a King County-based company that cleans, refinishes, and sells industrial drums and barrels, were convicted of one count of conspiracy to violate the Clean Water Act, 29 counts of violations of the Clean Water Act for Unlawful Discharge, four counts of false statements under the Clean Water Act, and one count of making false statements to the United States. Dkt. #218. After their convictions, Mr. Sanft and Seattle Barrel filed a Motion for a New Trial under Rule 33 (Dkt. ## 263, 267) and a Rule 29 Motion for Acquittal on Count 35, or in the Alternative, for a New Trial on Count 35 (Dkt. ## 265, 268). This Court denied Defendants' motion for acquittal on Count 35 and deferred ruling on Defendants' motion for a new trial due to newly produced discovery concerning trial witness Dennis Leiva ("Leiva"). Dkt. # 301.This Court now considers Defendants' various motions seeking a new trial or dismissal of the indictment.

## III.     BACKGROUND

### a.) King County Industrial Waste investigates Seattle Barrel.

On December 19, 2019, the government filed an indictment against Louie Sanft, John Sanft, and Seattle Barrel, charging them with 36 counts related to violations of the Clean Water Act. Dkt. # 1. During the 15-day trial, hundreds of exhibits were entered into evidence, Dkt. # 221, and over thirty witnesses, including Dennis Leiva ("Leiva" or "Mr. Leiva"), testified. Dkt. # 220.  On December 22, 2021, the jury returned a verdict of guilty on all counts. Dkt. # 218.

In 2012, a King County Industrial Waste Program (KCIW) employee observed John Sanft dumping an oily material into the sewer, and issued a penalty and compliance

ORDER – 2

order to Louie Sanft. TE 208, 213; Tr. 366-69. That same year, KCIW inspectors requested that Seattle Barrel install equipment to monitor the company's discharges and ensure that none exceeded a pH of 12. Although Louie Sanft did not agree to install monitoring equipment at that time, inspectors later observed an oily-appearing barrel near the final sump that discharged into the sewer. Tr. 375-77. Inspectors also saw in the Seattle Barrel office a lever that could be activated to flush clean city water into the area where samples were being collected. Tr. 388-89. KCIW later began surveillance monitoring, placing monitors and sampling equipment inside the sewer to determine what, if anything, was being discharged from Seattle Barrel. Tr. 397. Testing by KCIW revealed regular pH spikes over 12 in liquid coming out of Seattle Barrel, which was a violation of their KCIW discharge permits. Tr. 410-11. A sample with a pH of 13 is ten times more caustic than a sample with a pH of 12, and a sample with a pH of 14 is one hundred times more caustic than a sample with a pH of 12. Tr. 406. At trial, jurors reviewed the below chart—one of several reflecting readings taken at Seattle Barrel in 2013. TE 224; *see also* Tr. 409-10.



ORDER – 3

A few months later, in March 2014, KCIW issued a penalty and compliance order to Sanft and Seattle Barrel. TE 231. Seattle Barrel was prohibited from discharging any caustic wastewater into the sewer and required to route any sewer discharges through a monitored pipe. TE 236 at 8-10. To ensure compliance, KCIW requested that Seattle Barrel seal any openings in the facility that presented a "risk of illicit discharge," although inspectors missed a drain opening to the sewer (sometimes referred to as the "hidden drain") that was located in a back corner and remained unsealed. Tr. 813. Seattle Barrel was also required to report any sewer discharges, TE 236 at 13-15, and began reporting via monthly self-monitoring reports that no industrial wastewater discharges were taking place at the facility. TE 253-253C.

**b.) The EPA investigates Seattle Barrel.**

Eventually, the EPA became interested in Seattle Barrel's dumping activities, and in 2018 began covertly monitoring employee activity at the facility (including Leiva's presence and work schedule) and the spiking pH levels of discharges entering the sewer. TE 303, 303a, 303b. On the morning of March 8, 2019, discharge coming from Seattle Barrel reflected a spike in pH, and the EPA then executed a search warrant at the facility. Tr. 1413. Agents encountered Leiva seemingly dumping caustic wastewater into the sewer. Tr. 1416. Leiva then attempted to flee but was detained by agents. Tr. 1418. While he initially agreed to take part in a voluntary interview, Leiva expressed concerns that he would be arrested. Tr. 1418-20. Agents, who knew that Leiva was undocumented, Tr. 1412, attempted to "build rapport" with him and obtain information about what was happening at Seattle Barrel. Tr. 1419. Leiva stated that he wasn't doing anything wrong and that Seattle Barrel had previously been cited by authorities for dumping into the sewer. *Id.* Additionally, on the date the search warrant was executed, Louie Sanft took part in a voluntary interview with agents, portions of which were presented to the jury at trial. *See* TE 704.

ORDER – 4

**c.) Dennis Leiva becomes a material witness for the government.**

Ultimately, Leiva was held on a material-witness warrant, transferred to immigration custody, and detained at the Federal Detention Center in SeaTac. Tr. 1412, 1458. Leiva then entered a proffer with the government. However, before he did so, he asked about his immigration status and whether he would be deported back to Honduras. Dkt. # 320, Ex. 1. Only after the government informed Leiva that it had applied for a deferral of his deportation with the Department of Homeland Security (DHS) did Leiva agree to move forward with the proffer. *Id*. During this proffer, Leiva identified Louie and John Sanft as his "bosses" and the individuals who provided him with instructions regarding rules and regulations at Seattle Barrel. *Id.* at 2. He stated that Seattle Barrel drained caustic solution into the sewer in spite of KCIW's instructions not to do so. *Id.* at 4. Leiva said that Louie Sanft told him to drain the caustic tank into the sewer, but instructed him to avoid this task while Louie or John Sanft were on the premises and observe the building's surroundings to ensure that no KCIW inspectors were nearby before he did so. *Id.* Leiva stated that this was his task because he and Louie Sanft, while out at lunch one day, agreed that Leiva would be responsible for draining the caustic solution in exchange for being paid for an extra seven hours of work every week. *Id.* at 7. Leiva understood this arrangement to be mutually beneficial to them both because Leiva would make more money and Louie Sanft would avoid paying a wastewater collection company to remove the caustic solution from the premises. *Id.* Leiva also indicated that other workers knew about the caustic dumping. *Id.* When asked if Seattle Barrel management threatened him to do this because of his immigration status, Leiva stated that the term "illegal" was used in conversations by management, but he wasn't sure if management was joking. *Id.* at 2.

After his proffer interview, DHS deferred Leiva's potential deportation, and he obtained immigration counsel. On March 21, 2019, Leiva testified in front of a grand jury and was then transferred into DHS custody at the Northwest Detention Center. Dkt. # 333

¶ 3. While at the Northwest Detention Center, █████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ DHS

granted the EPA's request for deferred action on April 23 and Leiva was released from immigration custody on April 24, 2019. Dkt. # 331 ¶ 4 (Declaration of EPA Special Agent Goetz). Leiva was then transferred into the constructive custody of the EPA, where he was required to remain in contact with the government, cooperate with their investigation, and provide truthful information and testimony. TE 411.

Prior to trial, Leiva had several check-ins with government case agents throughout 2019 and 2020. Dkt. # 331 ¶¶ 8, 9. The EPA Agent does not recall Leiva or his immigration counsel raising the possibility of applying for a T-visa at any of these meetings. *Id.* ¶ 11, 14. Indeed, Special Agent Goetz, who testified at trial, states that he did not learn that Leiva had applied for a T-visa until he learned in April 2022 that it had been granted. *Id.* ¶ 14. The government prosecutor does not remember being informed by Leiva or his counsel that he applied for a T-visa and did not know of the existence of the T-visa process until he learned (also in April 2022) that Leiva had been granted one. Dkt. # 333 ¶ 13 (Declaration of Seth Wilkinson).

### d.) The government produces Leiva's incomplete immigration files to the defense.

The government produced 140,000 pages of discovery before trial, including reports of Leiva's check-ins with the prosecution and copies of interview notes. Dkt. # 333 ¶ 15. The defense was aware that Leiva hoped to be able to stay in the United States in exchange for his cooperation in the case against Defendants, and the defense "made

ORDER – 6

clear that it [would] seek to 'impeach Dennis Leiva's testimony on the basis of his hope to secure favorable treatment regarding his own immigration status.'" Dkt. # 311 at 8 (quoting Dkt. # 320, Ex. 16). In July 2020, the defense requested that the prosecution produce copies of Leiva's Alien File ("A-file") or other Immigration and Customs Enforcement (ICE) files. Dkt. # 320, Ex. 14. The prosecution agreed to do so and requested Leiva's A-file from an ICE officer based in Seattle. Dkt. # 333 ¶ 16. The prosecutor arranged for the ICE officer to upload the file electronically and asked the officer to "confirm one way or the other whether there is a physical file." Dkt. # 320, Ex. 15. The officer responded that there was a "T-file, or temporary file" that he had ordered and would arrive the next week. *Id.* The officer electronically uploaded the A-file to the file sharing site on July 7, and it was produced to the defense on July 9. Dkt. # 333 ¶ 16.

An A-file is comprised of records documenting an alien's history of interaction with United States Citizenship and Immigration Services (USCIS), ICE, and Customs and Border Protection (CBP), and is created when an application for benefits in relation to a pending enforcement action is received. Dkt. # 330 ¶ 3, 4. (Declaration of Lisa Rainville-Paré). Physical files may be digitized in accordance with USCIS procedures. *Id.* ¶ 5. A temporary file ("T-file") is a physical file utilized when an individual whose A-file has been digitized submits a paper immigration-based benefit request. *Id.* ¶ 8. Documents are housed in the T-file until DHS adjudicates the individual's request. *Id.*

Here, it appears that the prosecutor did not appreciate the connection between the *physical* file that he requested and the *temporary* file that the ICE officer indicated was on its way, because the prosecutor and the ICE officer did not speak further concerning this second file. Dkt. #333 ¶ 17. Indeed, the prosecutor represents that he expected the ICE officer to upload what the officer called the *temporary* file to the electronic file-sharing site as they had previously discussed and did not notice that the file was not uploaded. *Id.* ¶ 18. In fact, a physical copy of the temporary file, or T-file, was delivered to the U.S. Attorney's office, and the prosecutor (who was working remotely due to the

ORDER – 7

COVID-19 pandemic) was never alerted to its arrival at his office after it was placed on an unrelated stack of boxes. *Id.* ¶¶ 18, 19. The file was not scanned into the government's electronic database and was not produced to the defense until after trial. *Id.* ¶ 20.

The 88-page paper T-file contained documents related to Leiva's detention at the Northwest Detention Center. Dkt. #320, Ex. 21.

While neither the T-file nor A-file contained a copy of Leiva's eventual T-visa application, it is likely that had the parties reviewed the T-file, they would have requested a copy of Leiva's T-visa application from USCIS.

### e.) Leiva, and others, testify at trial.

#### 1.) Leiva's testimony

At trial, Dennis Leiva was a critical witness for the government and his credibility was vigorously contested. He testified that he usually drained Seattle Barrel's tank early on Saturday mornings so that the tank was clean by 7:00 a.m., at the direction of Louie and John Sanft. Tr. 881. He did so by setting up a pump to drain into what he called the "final hole" (sometimes called the "hidden drain" or "corner drain"). Tr. 893; TE 111A. According to Leiva, the task usually took between 15 and 30 minutes. Tr. 891. He testified that Louie Sanft told him to drain the caustic solution, but not when non-employees were around. Tr. 882. He also testified that he observed John and Louie Sanft adjust a valve to flush clean water into samples that were collected by KCIW. Tr. 883-884.

As to why he dumped the caustic wastewater, Leiva testified that he told Louie

ORDER – 8

Sanft that he wasn't going to leave his house early on a Saturday morning to dump caustic wastewater and only be paid for two hours' worth of work. Tr. 1007. While Sanft at one time offered Leiva a $100 bonus for the task, they later agreed that Leiva would be paid extra hours even though it took him less than an hour to drain the tank. Tr. 896. Leiva stated on the stand, "… I preferred the hours, because I was working less and I was still getting eight hours." Tr. 897:12-13.

During Leiva's direct examination, the government questioned him regarding immigration benefits that he received in connection with the case. The government asked, "Has anyone made you any promises about what will happen with your immigration status after this case is over?" to which Leiva replied, "No." Tr. 908. When asked what he expected to happen to his immigration status after the case concluded, he responded, "I'll probably be deported, but I have no idea. I don't know what's going to happen." *Id.*

The defense cross-examined Leiva on his role in the dumping, asking if he knew that what he was doing was illegal and pressing him on the fact that he did not call Louie Sanft on the morning before the EPA's search to get his express permission to drain water into the corner drain. Tr. 917, 920. Although Leiva insisted that "[i]t wasn't [his] decision to do so," and it was "normal" to drain caustic wastewater from the tank, testimony established that Leiva was ultimately the one who "put the hose into the corner drain and [] turned on the pump" so that the "water went into the sewer." Tr. 917, 918. The defense then connected Leiva's admittedly illegal acts to his desire to avoid being prosecuted and subsequent decision to point the finger at Louie Sanft, asking, "You were taken out of jail, and you were in custody, and went to the U.S. Attorney's Office and met with these gentlemen to give them information, correct?" and pointing to the thirteen days that Leiva spent in federal detention. Tr. 946.

During cross-examination, the defense clearly established that Leiva did not want to return to Honduras. Counsel questioned Leiva about his attempt to flee EPA agents in March 2019, asking, "[Y]ou ran because you didn't want to get deported, correct?" and

ORDER – 9

"You don't want to go back to Honduras, do you?" Tr. 945. The defense also questioned Leiva about his motivations for working with the government, working to establish that Leiva wanted assurances about his ability to stay in the country before speaking with authorities, and asserted that Leiva did not put the blame on Louie Sanft until he signed an agreement with the prosecution. Tr. 948, 950. (Counsel asked, "Isn't it true, Mr. Leiva, that you told the gentlemen at that meeting, the prosecutors and others that were at that meeting, that you wanted to know what would happen to your immigration status before you answered any questions?" and "You didn't tell the United States that Louie Sanft ordered you to put water down the sewer until you signed this agreement on March 21st…?") At closing the defense argued that Leiva's story was "all over the map" (Tr. 2584), "inconsistent on almost every critical aspect of the case," (Tr. 2598) and directly compared Leiva's testimony and credibility with that of Louie Sanft, reminding the jury, "You are supposed to treat [Leiva's] testimony with greater caution than other witnesses." Tr. 2597. Indeed, the defense called into question the government's judgment in relying on Leiva as a witness, asking jurors, "Can Dennis Leiva just lie to them repeatedly and give inconsistent stories about how this agreement was hatched and when it was hatched and how much he was paid and why he did it?" Tr. 2599.

The defense worked to discredit Leiva's testimony by calling to the stand six current and former Seattle Barrel employees who contradicted Leiva's claim that multiple co-workers knew about the dumping activities. Enrique Alvarez, Isaac Ambrose, Ryan Bradley, Nettie Cohodas, Kevin Larson, and Rito Reyes testified that they did not witness Leiva engage in dumping. Tr. 1617, 1660, 1702, 1762-63, 1820, 1885-86. In addition, the defense called multiple character witnesses who gave their opinion that Louie Sanft was an honest person and expert witnesses who testified that Seattle Barrel received no financial benefit from illegal dumping and that the caustic tank could have been cleaned with a "boil down process" that would not require dumping. *See* Dkt. # 263 at 9-12.

ORDER – 10

**f.) Defendants move for a new trial.**

On March 2, 2022, Mr. Sanft moved for a new trial under Rule 33, Dkt. # 263, and for acquittal or a new trial on Count 35. Dkt. # 264. Seattle Barrel moved for a new trial and joinder on the same date. Dkt. # 267.

**g.) Post-trial, the government discovers the paper T-file.**

After trial, Leiva's deferral of deportation was extended by one year. Dkt. #333 ¶ 21. In late March 2022, Defendants requested a production of various documents, including those related to Leiva. Dkt. # 320, Ex. 18. The government provided documents related to the extension of Leiva's deferral, and on April 18, the prosecutor informed defense counsel that he had learned that day that Leiva had applied for and would receive a T-visa. *Id.* Defense counsel then requested that the government supplement Mr. Leiva's A-file. *Id.*

The prosecutor then requested an updated A-file from ICE. Dkt. # 333 ¶ 29. According to the prosecutor, the ICE officer (a different officer than the one who previously uploaded Leiva's A-file in July 2020) told the prosecutor that there was a separate temporary file. *Id.* This reference caused the prosecutor to check his electronic case database for a temporary file uploaded in 2020, but he found no record of this. *Id.* He then searched his office, and on April 28, 2022, he located Leiva's T-file. *Id* ¶ 30. After speaking with USCIS regarding confidentiality provisions relating to the file, the prosecutor wrote to defense counsel regarding his discovery, explaining that it had been physically delivered in 2020 but not produced to the defense due to the prosecutor's oversight. Dkt. # 320, Ex. 20. After the entry of a protective order on May 2, the government produced the T-file to the defense that day. Dkt. # 286; Dkt. # 333 ¶ 20. Defendants then jointly moved to dismiss the indictment or for a new trial. Dkt. # 311.

ORDER – 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.   DISCUSSION

Defendants have moved for a new trial on various grounds, including both Rule 33, which provides that this Court may vacate the judgment and grant a new trial "if the interest of justice so requires," Fed. R. Crim. P. 33(a), and a *Brady* violation. The Court first considers Defendants' request for a new trial under *Brady*.

### a.) Motion for a New Trial Due to *Brady* Violations (Dkt. # 311)

1.) *Brady* Standards

"The Fifth Amendment's Due Process Clause requires the government to produce exculpatory information to the defense." *United States v. Mazzarella*, 784 F.3d 532, 538 (9th Cir. 2015) (citing *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963)). "This includes information used to impeach prosecution witnesses." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 152-54, 92 S. Ct. 763 (1972)). The elements of a *Brady/Giglio* violation are: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Wilkes*, 662 F.3d 524, 535 (9th Cir. 2011) (quoting *United States v. Kohring*, 637 F.3d 895, 903 (9th Cir. 2011)). Suppression may be either intentional or inadvertent, and even "[a]n 'innocent' failure to disclose favorable evidence constitutes suppression even when there is no allegation that the prosecutor acted 'willfully, maliciously, or in anything but good faith'—'sins of omission are equally within *Brady*'s scope.'" *United States v. Olsen*, 704 F.3d 1172, 1181 (9th Cir. 2013) (quoting *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009)). A *Brady* violation may also occur in the post-trial context. *Mazzarella*, 784 F.3d at 538. Generally speaking, the appropriate remedy for a *Brady* violation is a new trial. *See Kohring*, 637 F.3d at 913 (quoting *U.S. v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008)).

"The terms 'suppression,' 'withholding,' and 'failure to disclose' have the same meaning for *Brady* purposes." *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002).

ORDER – 12

Here, Leiva's T-file was clearly suppressed. The prosecutor acknowledged that the T-file was in his possession but was "not produced because of an oversight for which I am responsible." Dkt. # 320, Ex. 20; *see also* Dkt. # 320, Ex. 21, 22; Dkt. # 333 ¶ 30. Further, the evidence was favorable to the defense, as it revealed ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The defense would likely have extensively questioned Leiva on a claim revealed by his T-visa application; ███████████████████████████████ ████████████████████████████ versus his earlier statement to the EPA that Louie Sanft agreed to pay Leiva extra wages in order to get him to dump the chemicals. *Id.* at 20; *see also* Dkt. # 320, Ex. 22 at 31; Dkt. # 320, Ex. 1 at 7. Leiva again at trial testified that he was paid extra by Louie Sanft for dumping. Tr. 896; Tr. 1006-1007. Although Leiva has never disavowed ████████████████████████████████ ██████████████████████, from the defense's perspective, this would have been a ripe area for cross-examination and attacking Leiva's credibility further.

2.) *Analysis*

Despite the fact that the government suppressed favorable evidence, Defendants fail to show that had the T-file (and the T-visa application that both parties would likely have then obtained) been available, the result of the trial "would have been different." *United States v. Strifler*, 851 F.2d 1197, 1202 (9th Cir. 1988). "Prejudice ensues 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Mazzarella*, 784 F.3d at 538 (quoting *Kohring*, 637 F.3d at 902)). This does not mean that the defendant must show "that the evidence if disclosed probably would have resulted in acquittal." *Price*, 566 F.3d at 911 (citing *United States v. Bagley*, 473 U.S. 667, 680 (1985)). Instead, "[t]here is a

ORDER – 13

1

2
reasonable probability of prejudice when suppression of evidence undermines confidence
in the outcome of the trial." *Kohring*, 637 F.3d at 902 (citing *Kyles v. Whitley*, 514 U.S.

3
419, 434 (1995)) (quotation omitted). The Court finds that is not the case here.

4
"In considering whether the failure to disclose exculpatory evidence undermines

5
confidence in the outcome," this Court must "undertake a careful, balanced evaluation of

6
the nature and strength of both the evidence the defense was prevented from presenting

7
and the evidence each side presented at trial." *United States v. Jernigan*, 492 F.3d 1050,

8
1054 (9th Cir. 2007) (quoting *Bailey v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003)). This

9
means the suppressed T-visa file and related documents "must be analyzed in the context

10
of the entire record." *Id.* (quoting *Benn*, 283 F.3d at 1053). The record before this Court

11
does not reflect a trial where "the government's other evidence at trial [was]

12
circumstantial," where "defense counsel [would have been] able to point out significant

13
gaps in the government's case through cross-examination," or where "witnesses provided

14
inconsistent and inaccurate testimony." *United States v. Bruce*, 984 F.3d 884, 898 (9th

15
Cir. 2021). In fact, this Court observed the opposite.

16

17
      i.     *The government produced ample scientific and technical evidence against Defendants.*

18

19
First, the scientific and technical evidence against Mr. Sanft that did not stem from

20
Leiva's testimony was substantial. Jurors learned that over ten years ago, KCIW began

21
looking into Seattle Barrel's dumping procedures, observed John Sanft discharging oil

22
into the sewer, and after discovering violations of Seattle Barrel's permit, issued a

23
violation notice. Tr. 366-369; TE 210. This information was given to Louie Sanft. *Id.* A

24
KCIW compliance investigator also testified about a hidden lever in the Seattle Barrel

25
facility that could be used to flush fresh water into the County's sample so as to dilute the

26
reading. Tr. 389. KCIW's monitoring of Seattle Barrel's operations showed waste

27
discharges that regularly exceeded Seattle Barrel's permitted amounts, with pH and

28
temperature spikes occurring at regular intervals. Tr. 410-412; TE 224; TE 228. Further,

ORDER – 14

the jury learned that in 2014, KCIW issued a waste discharge permit that added specific language prohibiting Seattle Barrel from dumping caustic water—"Seattle Barrel Company shall not discharge the caustic drum/barrel wash solution to the sanitary sewer system without prior approval from KCIW"—not because Seattle Barrel had previously been allowed to do so, but because KCIW felt the need to make this condition "clear." Tr. 446-47; TE 236 at 9-10. A KCIW employee testified that they inspected Seattle Barrel in order to ensure that wastewater would pass through a pretreatment system and its pH be monitored. Tr. 809-810. KCIW found there to be a "reasonable potential" that discharges would not be picked up by the monitoring program and requested that Defendants seal various openings on the premises. Tr. 809-817. However, Mr. Sanft testified that he did not fill all of the drains because it was his opinion that they could possibly be used at a later time should the building be used by someone else. Tr. 2217-2218.

The EPA's subsequent investigation revealed ongoing dumping that implicated Seattle Barrel employees. The EPA's data based on surveillance testing in 2018 revealed similar pH and temperature spikes as those previously observed by KCIW. TE 303a, 303b, 304a. The EPA observed spikes that started around 6:00 a.m. and lasted from 30 to 45 minutes. Tr. 1373. Physical sampling indicated that that the material was "consistent with what you would expect from the caustic hot water tank." *Id.* According to testimony from the EPA's chief scientist, data analysis of covertly collected wastewater samples was consistent with samples later collected from Seattle Barrel's caustic tank. Tr. 1072.

When the EPA, as part of its investigation, was able to confirm that discharges were taking place at the Seattle Barrel facility and what the discharged material was, their next step was to investigate who was responsible for the discharges and how they were taking place. Tr. 1374. Video monitoring showed that Leiva was present for the discharges (he was usually the first person to arrive at work and discharges started within a few minutes) and John Sanft was often present just prior to the discharges as well. Tr. 1383-1384. EPA Agent Goetz testified that his investigation showed that there was only

one permitted discharge point at Seattle Barrel. Tr. 1411. During the execution of a search warrant in the early morning hours of March 8, 2019, agents found Leiva dumping caustic solution into the sewer as a wet pump was being used between Seattle Barrel's caustic tank and boiler. Tr. 1416-1417; TE 701. Other Seattle Barrel employees were also present. *Id.* The jury had little reason to doubt testimony from EPA agents and testing evidence showing obvious pH and temperature spikes present in material emanating from Seattle Barrel.

Also significant was Louie Sanft's claim that he hired Emerald Services to remove the caustic water offsite. The government presented business records suggesting that Seattle Barrel rarely, if ever, actually sent the wastewater offsite. TE 802A. While on the stand, Sanft then testified that the caustic water was instead "reused." Tr. 2239. When asked why he would pay Emerald Services to ship wastewater that could be reused, Sanft explained that he only shipped caustic solution to Emerald Services in order to gain their business and potentially sell them drums and other services in the future. Tr. 2357-2358.

ii.     *Leiva was not the only source of evidence implicating Defendants.*

While Defendants contend that Leiva was the "only witness" implicating Mr. Sanft and Seattle Barrel in the caustic solution dumping, *see* Dkt. # 311 at 23, 37, 39, this is belied by the evidence presented at trial. *Compare* Tr. 1545-1549 (testimony of Mark Henderson that he witnessed Leiva discharging wastewater and informed Sanft, who told him that it didn't happen) *with* Tr. 2333-3336 (testimony of Sanft that, after speaking with Henderson, Sanft confronted Leiva and believed Leiva's denials). Indeed, Sanft's knowledge of and involvement in the charged conduct was supported by the testimony of Leiva and Henderson and even Sanft's own words. For example, in Sanft's March 8, 2019 interviews with EPA agents, Sanft claimed that Seattle Barrel removed caustic wastewater by evaporation. TE 704.06. However, testimony from expert witness Blake Stapper suggested that it was impractical to do so—it would take 16 hours to evaporate the solution from 24 to 3 inches. Tr. 1151. In the same interview, Sanft claimed that no

ORDER – 16

one from Seattle Barrel was discharging into the sewer, TE 709.09, but later that day admitted that John Sanft and Henderson told him about Leiva doing just that. TE 704.17. Although Sanft testified that he believed Leiva's denials, Tr. 2336, it appears that the jury did not find this testimony persuasive. During the interview, agents also confronted Louie Sanft regarding his failure to seal the "illegal discharge point," or so-called "hidden" or "corner drain." TE 704.18. When asked if he was aware of it, Louie Sanft responded, "not exactly." TE 704.18. Then, within seconds, he said he thought it was cemented in. *Id.* He then stated that he *did* know about it but didn't know that anyone was discharging into the sewer. *Id.* In that same exchange, the EPA agent confronted Louie Sanft with the fact that both John Sanft and Henderson told Louie Sanft that they believed Leiva was engaging in wrongdoing. *Id.* While Leiva was clearly a critical witness, his testimony was not the only evidence establishing Louie Sanft's knowledge of the dumping. The defense described Mr. Sanft as a "hands-on owner… who was fully engaged in operations…." A reasonable juror, hearing Mr. Sanft's own words during his EPA interview and his testimony on the stand, could find that such a hands-on owner would be aware of the activities going on at Seattle Barrel.

> ### iii. Leiva's potential motivations for testifying against Defendants were presented to the jury.

Defendants, relying on *United States v. Obagi*, argue that the government's portrayal of Leiva to the jury amplified the prejudice experienced by the defendants. 965 F.3d 993, 998 (9th Cir. 2020). In *Obagi*, the government failed to disclose a witness's prior immunity deal in a separate case involving similar charges and then turned over 4,750 pages of related materials in the month after trial. *Id.* at 996. While the government's initial oversight in disclosing the prior immunity deal was discovered during closing arguments, allowing the court an opportunity to give the jury a curative instruction, the prosecution had already emphasized to the jury at closing that the key witness's testimony was "independent corrobora[tion]" of the testimony of the culpable

ORDER – 17

cooperators. *Id.* In fact, the witness had already testified that she had not entered into "any agreement" or immunity deal with the government. *Id.* While the district court found that the omission did not deprive defendants of a fair trial, the Ninth Circuit found that defendant's counsel completed closing arguments "without the benefit of being able to attack [the witness's] credibility." *Id*. at 998.

Such is not the case here, where the defense and jury were aware of Leiva's deferred action agreement with the government and the benefit it provided to Leiva. *See* Tr. 289-290 (Defense counsel stated, "[Leiva] struck a deal with the government in this case…Mr. Leiva is currently in this country, he's been able to stay in this country… he's not been deported, in exchange for pointing his finger at Louie….Dennis Leiva, the guy who, without any question, committed these crimes, has been told by our government he's a witness in this case; he will not be charged with a crime."); Tr. 906-908 (Government elicited testimony during direct examination of Leiva that he was allowed to stay in the country in exchange for checking in with EPA agents and providing information to the government in this case); Tr. 937 (Defense establishes, on cross-examination, that Leiva was a witness in the case and would not be charged with a crime); Tr. 945 (Defense asks, "You don't want to go back to Honduras, do you?" Leiva answered, "Honestly, I don't."); Tr. 9447-48 (Defense asks whether Leiva wanted to know what would happen to his immigration status before he answered the EPA's and U.S. Attorney's office's questions); Tr. 948 (Defense asks Leiva, "Are you aware that you can get a green card for being an informant to law enforcement?"); TE 1302 (Leiva's March 21, 2019 Proffer Agreement). And the jury was instructed to consider whether Leiva's testimony was influenced by any benefits he received from the government and examine his testimony with greater caution. Dkt. # 2156 at 23, Instruction No. 21. Ultimately, the government's suppression did not deprive the defense of an opportunity to impeach Leiva on his desire to stay in the United States and the benefits he received from the government in exchange for his cooperation. Leiva was extensively cross-

ORDER – 18

examined on exactly that point. Here, comparing the voluminous evidence presented to the jury with the gaps in evidence created by the suppressed material does not undermine this Court's confidence in the verdict.

Finally, Leiva did not disavow or even truly contradict his trial testimony in later interviews with the EPA. In an August 2022 interview with EPA agents and the U.S. Attorney's Office ███████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████ Although he recalled that Agent Goetz always asked him about his immigration status at check-ins, he did not recall telling the government about his T-visa application. *Id.* at 4. As to why ████████████████████████ ████████ Leiva explained that was due to this Court's ruling and the instruction he received to not discuss his immigration status. *Id* at 4; *see also, e.g.,* Tr. 998-999 (during a break in Leiva's testimony, the prosecutor clarified and reaffirmed to Leiva that he was not to discuss his immigration status, stating "Mr. Leiva, I just want to make sure you know that you should not go into whether Mr. Sanft knew that you were in this country illegally and not permitted to work here. The court doesn't want you to testify about that."). As to why he testified at trial that he would "probably" be deported but had "no idea" what would happen, he explained that his immigration attorney made no promises that he would gain a visa—it was "always a maybe." *Id.* at 2. All told, when confronted with his divergent statements to the asylum officer (that Sanft paid him extra to dump) and ████████████ ██████████████████████████████████████████████ Leiva reiterated that he received both extra pay ████████████████████████ ████████ Leiva's post-trial interview, when compared to his pre-trial and trial statements,

ORDER – 19

do not point to a purposeful concealment of his true motivations on the part of the government (or even Leiva), but instead show a series of missed opportunities to understand the fuller picture of his testimony. *See Bruce*, 984 F.3d at 899 (Ninth Circuit upheld district court's denial of a new trial under *Brady* when no witness recanted their trial testimony, post-trial interviews did not controvert the government's evidence, and there was "overwhelming evidence" supporting the jury's verdict).

This was not a close case. *Compare* Tr. 2260 (Here, after a two-week trial, the jury began deliberations on December 22, 2021 and reached a verdict within hours) *with United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) ("This was a close case: The jury deliberated for over two days after a one-and-a-half-day trial.") Analyzing the suppressed evidence in the context of the entire record, *Benn*, 283 F.3d at 1053, it is unlikely that this information would have materially altered the jury's assessment of Leiva's credibility, and this Court therefore concludes that there is no reasonable possibility that the verdict would have been different if the temporary file had been disclosed. *See Olsen*, 704 F.3d at 1185 ("Even if Melnikoff's credibility as a witness had been totally destroyed, we are confident beyond doubt that the jury would have found [Defendant] guilty, based on the overwhelming evidence presented by the government…"). In spite of the government's failure to produce Leiva's temporary file, Defendants received a "trial resulting in a verdict worthy of confidence." *Id.* (citation omitted).

3.) *Jencks Act and Rule 16 Violations*

Defendants request dismissal of the case on the basis of a Jencks Act violation. Dkt. # 311 at 35. The Jencks Act, 18 U.S.C. § 3500(b), requires that, after a government witness has testified on direct examination, the government must give the defendant any statement in the government's possession that was made by the witness relating to the subject matter to which the witness testified. *United States v. Alvarez*, 358 F.3d 1194, 1207 n. 7 (9th Cir. 2004). A "statement" is (1) a written statement made by the witness

ORDER – 20

and signed or otherwise adopted or approved by him, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement by a witness before a grand jury. *Id; see also* Fed. R. Crim. P. 26.2. Specifically, Defendants argue that two of Leiva's statements fall within the meaning of the Jencks Act

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█      Here, Defendants must show that "prejudice to [their] substantial rights" resulted due to the alleged violation. *Alvarez*, 358 F.3d at 1210 (citing *United States v. Michaels*, 796 F.2d 1112, 1117 (9th Cir. 1986)). If Defendants do not establish that timely production of the interview notes would have been likely to affect the outcome of the trial, any error is "harmless." *Id.*

Similarly, Defendants argue that the government violated Federal Rule of Criminal Procedure 16. Under Rule 16, the government must, upon request, turn over any documents within the government's possession, custody, or control that are material to preparing the defense. Fed. R. Crim. P. 16; *see also United States v. Cano*, 934 F.3d 1002, 1022 (9th. Cir. 2019). Rule 16, while "broader than *Brady*" because it covers material that may not be exculpatory or impeaching, still requires a showing of materiality. *Id.* at 2022-23. For the reasons explained above, *see supra* Section IV(a),

---

[1] The officer's interview memorandum states "***NOTE: This is not a verbatim recording of this interview.***" Dkt. # 320, Ex. 21 at 2. Defendants argue that the asylum officer's interview notes appear to be "substantially verbatim based on the extent to which the notes conform to Leiva's language patterns, the length of the interview as compared to the length of the written statement, and fact that the notes appear to have been written on the same day as the interview." Dkt. # 311 at 39-40 (citing *United States v. Houlihan*, 937 F. Supp. 65 (D. Mass. 1996)).

ORDER – 21

1    Defendants can show neither prejudice to their substantial rights or materiality, such that

2    a new trial or sanctions are required.

3        4.) *Dismissal of the Indictment*

4        Lastly, Defendants argue that this Court should, in addition to vacating the

5    verdicts, dismiss the indictment altogether. Dkt. # 311 at 32. Defendants argue that the

6    government's "flagrant disregard of its constitutional obligation to disclose exculpatory

7    information, the substantial prejudice to the defendants, and the need to deter this type of

8    recklessness in the future all warrant dismissal." *Id.* at 31-32. The government contends

9    that its mistake was "inadvertent," and "not purposeful or reckless" such that dismissal is

10   not warranted. Dkt. # 329 at 58.

11       "A district court may exercise its supervisory power 'to implement a remedy for

12   the violation of a recognized statutory or constitutional right; to preserve judicial integrity

13   by ensuring that a conviction rests on appropriate considerations validly before a jury;

14   and to deter illegal future conduct." *U.S. v. Chapman*, 524 F.3d 1073, 1085 (9th Cir.

15   2008) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991), *abrogated*

16   *on other grounds as recognized by United States. v. W.R. Grace*, 526 F.3d 499, 511 n.9

17   (9th Cir. 2008)). The Court may only dismiss an indictment under its supervisory powers

18   when the defendant suffers "substantial prejudice" and there is no lesser remedy

19   available. *Id.* at 1087 (citing *United States v. Jacobs*, 855 F.2d 625, 655 (9th Cir. 1988)).

20   Critically, "because dismissing an indictment with prejudice encroaches on the

21   prosecutor's charging authority, this sanction may be permitted only in cases of flagrant

22   prosecutorial misconduct." *Id.* at 1085. (quotations omitted). "[T]he Supreme Court as

23   well as the Ninth Circuit has repeatedly pointed out that dismissal of an indictment,

24   particularly with prejudice, is a drastic measure." *United States v. Isgro*, 974 F.2d 1091,

25   1098 (9th Cir. 1992). Here, the Court finds that the government's failure to disclose the

26   Leiva files were "accidental or merely negligent," and therefore insufficient to establish

27   "flagrant misbehavior." *Id.*; *see also United States. v. Bundy*, 968 F.3d 1019, 1038 (9th

28   ORDER – 22

Cir. 2020) ("[F]lagrant misconduct cannot be an accidental or merely negligent failure to disclose," even if it need not be intentional.).

The Government's pre- and post-trial disclosures to the defense concerning Leiva's immigration status confirm this. Prior to trial, the government provided to the defense copies of interviews, emails, documentation of Leiva's check-ins with government agents, and Leiva's A-file. Post-trial, in April 2022, the government updated the defense that Leiva's deferred action was extended for another year and soon thereafter informed defense counsel that Leiva had applied for and been approved for the T-visa. Dkt. # 333 ¶¶ 21, 22. And the day after the government discovered the physical temporary file that it had received in July 2020, the prosecutor wrote to defense counsel to inform them of the oversight and take responsibility for the omission. *Id.* ¶ 30; Dkt. # 320-20 at 2-3. The facts here stand in contrast to cases in which the court found it appropriate to dismiss the indictment due to *Brady* violations. *See, e.g., Bundy,* 968 F.3d 1019 (government withheld "important evidence" favorable to defense such as video surveillance of defendants' property, FBI investigative reports detailing the presence of armed snipers and SWAT personnel near defendants, and multiple threat assessments); *Chapman,* 524 F.3d at 1079 (during trial, the government produced 650 pages of "rap sheets, plea agreements, cooperation agreements, and other information related to numerous government witnesses," including three witnesses who had already testified).

Defendants argue that the government's failure to find the envelope labeled "T-file" was more than an oversight, as the prosecutor's office "fail[ed] for nearly two years to open an envelope." Dkt. #343 at 40. However, this glosses over the fact that in 2020, when the government requested Leiva's immigration files, most offices were closed to in-person work, and all prior documents that the government requested of ICE had been electronically uploaded (including documents originally received in hard copy). Dkt. # 333, 5-7. Defendants now point to many junctures at which, they allege, the government should have sought further information about Leiva's immigration status and they

ORDER – 23

characterize the government's failure to learn of the T-visa prior to 2022 as an effort to remain "ignorant," but the government rightly points out that this is heavily influenced by hindsight bias.

"Simply showing a *Brady* violation," which the defense has not done here, "is not a sufficient basis to dismiss an indictment." *Bundy*, 968 F.3d at 1031. And because the government did not engage in "flagrant misconduct" that resulted in "substantial prejudice" to the accused, this Court declines to dismiss the indictment. *Id.*

5.) *Seattle Barrel's Clean Water Act Convictions*

The defense argues that because Seattle Barrel's Clean Water Act convictions hinged on Leiva's credibility, the suppressed evidence would have been used to undermine the entirety of the government's case. Dkt. # 343 at 27. In order to prove its case, the defense argues, the government had to establish that Leiva's intent in discharging to the sewer was at least in part to benefit the company and was within the scope of his authorization. *Id.* The suppressed evidence could have been used to attack Leiva's explanation for why he engaged in dumping and if he was doing it to benefit Seattle Barrel at all. *Id.* at 28. In closing, Seattle Barrel drove this point home, arguing that Leiva was not acting for the benefit of the company because he admitted that he falsely claimed overtime wages and stole from the company. Tr. 2609. Ultimately, the jury rejected Seattle Barrel's argument. This Court sees no reason to depart from the jury's reasonable conclusion that Leiva's actions were taken, at least in part, to benefit Defendants.

Because it is clear that Leiva engaged in dumping caustic wastewater into the sewer, and Seattle Barrel is liable for the acts of its employees, Seattle Barrel's convictions must stand. "The acts of an agent may be imputed to the principal… but only if it is the agent's purpose to benefit the principal, thus bringing his acts within the scope of his employment." *United States v. Beusch*, 596 F.2d 871, 878 (4th Cir. 1979) (internal citations omitted). "If intent to benefit is present, then actual benefit is largely irrelevant."

*Id.* (citation omitted). Such is the case here. Leiva's actions allowed Seattle Barrel to sidestep KCIW's clear directives prohibiting discharge of waste into the storm sewer system, and the jury concluded that he understood his actions at the time to provide a benefit to Defendants. And Leiva's self-interest in the scheme does not negate the benefit he believed he brought to his bosses. *See United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 407 (4th Cir. 1985) ("It would seem entirely possible…for an agent to have acted for his own benefit while also acting for the benefit of the corporation.") Further, Defendants' claims that Leiva's actions violated Seattle Barrel's instructions or policies against dumping do not undermine this finding. *See Beusch*, 596 F.2d at 877-78; *see also* Jury Instruction No. 17[2]. Because the jury is presumed to have applied the instruction as directed, *Richardson v. Marsh*, 481 U.S. 200, 210 (1987), Seattle Barrel's convictions must stand.

**b.) Rule 33 Request for New Trial (Dkt. ## 263, 267)**

Prior to the discovery of the suppressed Leiva file, Defendants filed several motions seeking acquittal or a new trial. Dkt. ## 263, 265, 267. The Court now addresses those motions. Rule 33(a) of the Federal Rules of Criminal Procedure provides, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Such a motion is "directed to the discretion of the judge." *United States v. Pimintel*, 654 F.2d 538, 545 (9th Cir. 1981). In considering a motion for a new trial, the court need not view the evidence in the light most favorable to the verdict, but may weigh the evidence and evaluate for itself the credibility of the witnesses. *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000).

Defendants make several arguments in support of their request for a new trial: 1)

---

[2] The jury was instructed, "A corporation may be responsible for the acts of its agents or employees if the acts are done or made within the scope of their authority and are done or made with the intent, at least in part, to benefit the corporation. The corporation may be responsible for the acts of its agents or employees even though the conduct is contrary to the corporation's actual instruction or the corporation's stated policies."

ORDER – 25

the government improperly vouched for Leiva and against defense witnesses, made false assertions and implications to the jury during testimony and closing, and used inadmissible statements from John Sanft against Louie Sanft; 2) the Court failed to instruct the jury on lesser-included offenses, specifically, an instruction concerning whether Louie Sanft was guilty of negligently causing an illegal discharge; and 3) the weight of the evidence strongly preponderates against the guilty verdicts. Dkt. ## 263, 267[3].

> 1.) *Government Impropriety*
>> i.     *Vouching*

Defendants argue that the government engaged in several improper tactics to bolster the credibility of the prosecution's witnesses at trial, including improperly vouching *for* Leiva and *against* several defense witnesses. Dkt. # 263 at 15-22. Specifically, Defendants cite to the government's rebuttal statement that "statements, notes, [and] memoranda" from Leiva's "ten to twelve statements" were "remarkably consistent over time." Dkt. # 263 at 15 (citing Tr. 2642). This came about because, in closing, the defense argued that Leiva was "all over the map" (Tr. 2584) and his claim that multiple Seattle Barrel employees were also aware of the dumping was a "pretty big whopper." Tr. 2597-98. Indeed, the defense argued that Leiva was "inconsistent on almost every critical aspect of the case," and that the government made a misstep by continuing to rely on him as a witness because they had been "working with Leiva for two years… listened to his inconsistent stories about what happened… listened to him say that people can back him up that don't, and yet they have continued to work with him." Tr. 2598.

In rebuttal, the government pushed back, arguing that Defendants' six lawyers carefully reviewed Leiva's statements in order "to find something, anything to discredit

---

[3] Seattle Barrel joins in and incorporates by reference the arguments made in Louie Sanft's Rule 33 motion for a new trial. Dkt. # 267 at 13.

this guy" and portray his story as inconsistent. Tr. 2642. But instead, the prosecution asserted, "Mr. Leiva's testimony was remarkably consistent over time." *Id.*

Improper vouching may serve as a basis for reversal, and rightfully so: "[t]he prosecutor's vouching for the credibility of witnesses… can convey the impression that evidence not presented to the jury, but known to the prosecutor, support the charges against defendant," and because the prosecutor's opinion is weighty, jurors may be induced to trust the government's judgment rather than their own. *United States v. Young*, 470 U.S. 1, 18-19 (1985). There is no "bright-line rule about when vouching will result in reversal." *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993). The Court considers various factors, including:

> "the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall."

*Id.* If the defense failed to raise an objection at trial, or if the Court must assess the combined prejudicial effect of multiple errors when only some have been timely objected to, a reviewing court will employ a "plain error" standard. *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1190 (9th Cir. 2015).

Here, the vouching engaged in by the government did not rise to the level of plain error. While Defendants are correct that the prosecutor is subject to a higher ethical bar than attorneys representing private parties, the Court finds persuasive the government's argument that the prosecutor did not give the jury a "personal assurance" that Leiva was telling the truth but instead drew an inference from the record that what the defense characterized as testimony that was inconsistent on every important issue was actually consistent over time. *See Necoechea*, 986 F.2d at 1279. Although the defense argues that the government relied on facts not in evidence to bolster Leiva's credibility, this Court

1    does not find that to be the case, because the government's inference from the record was

2    based on Agent Goetz's testimony on direct and cross-examination concerning his

3    multiple meetings with Leiva and the statements made by Leiva therein. Because the

4    defense "opened the door" to the prosecutor's rebuttal statements, this Court "cannot

5    conclude that it more probably than not affected the verdict" so as to require a new trial.

6    *See United States v. Falsia*, 724 F.2d 1339, 1342-43 (9th Cir. 1983).

7        The same is true for Defendants' arguments that the prosecution improperly

8    vouched *against* the defense's witnesses, such as Ambrose and Bradley. Dkt. # 263 at 20-

9    21. Defendants point to an exchange between the prosecutor and defense witness and

10   former Seattle Barrel employee Isaac Ambrose in which the prosecutor repeatedly asked

11   for Ambrose's "honest answer" and "honest testimony," Tr. 1625, 1627, 1628, eventually

12   drawing a sustained objection when the prosecutor again told Ambrose that the

13   government "just wanted [Ambrose's] testimony." Tr. 1636. However, the context of this

14   testimony reveals that this exchange was more of a back-and-forth than a constant assault

15   on the part of the government, with Ambrose—after giving several somewhat rambling

16   and circuitous answers—firing back that he wanted a police officer to put the prosecutor

17   into custody for badgering him. Tr. 1624-25. The prosecutor's questioning of Ambrose or

18   characterization of witness Bradley's testimony as not credible simply were not

19   statements designed to leverage the prestige of the government in order to impress the

20   prosecutor's personal opinion on the jury, but were inferences from the trial record. *See*

21   *United States v. Weatherspoon*, 410 F.3d 1142, 1147 (9th Cir. 2005) (explaining

22   prosecutorial vouching and expressing personal opinion).

23        *ii.    False Assertions or Implications Made to the Jury*

24        Similarly, Defendants argue that the prosecution made several false assertions to

25   the jury, including, that Defendants were required to seal all the drains at Seattle Barrel,

26   that KCIW conclusively determined in 2013 that discharges were coming from Seattle

27   Barrel's caustic tank, that witness Kevin Larson changed his story, that several former

28   ORDER – 28

Seattle Barrel employees could face criminal liability, that the defense tampered with witnesses and witnesses lacked credibility because they retained counsel, and other alleged improprieties. Dkt. # 263 at 23-37. Defendants cite to *Berger v. United States*, 295 U.S. 78 (1935), in support for their contention that the prosecution's tactics were "improper and incredibly prejudicial" and warrant a new trial. Dkt. # 263 at 25. However, each of the allegedly improper tactics pursued by the government were based on inferences from the record and ultimately resulted in no prejudice to Defendants, as opposed to the *Berger* prosecutor, who engaged in an "undignified and intemperate" argument, causing an "evil influence" on the jury. 295 U.S. at 85. Defendants' attempt to compare the government's strategy to cases illustrating the most egregious behavior on the part of prosecutors does them no favors. For example, Defendants argue that the government improperly questioned witness Rito Reyes-Estrada about his testimony that he left Seattle Barrel in 2015, while payroll records show that he was paid in 2016 and 2017. *Compare* Tr. 1657 *with* Tr. 1669. During cross-examination, the government questioned why Reyes was listed on payroll records during times he claimed to be in Honduras. Defendants argue that the government raised this inconsistency in order "for the jury to assume that there must have been something nefarious behind the discrepancy," and suggests that the jury could have believed that Reyes was kept on the books for a tax benefit or as payment to keep him quiet about the caustic discharges. Dkt. # 263 at 32. But the government never asserted this, and Defendants have, with no basis, chosen to fill in what they see as narrative gaps with decidedly nefarious motives. This is not a basis for a new trial.

> iii.    *Use of John Sanft's Statements During Defendants' Trial*

In November 2021, one month before trial, this Court partially granted Louie Sanft's motion to exclude and ordered that two of John Sanft's statements (that Louie Sanft "knows exactly what [Leiva] does" with the caustic liquid, and that Louie Sanft was personally responsible for hiring a contractor to fill in the corner drain into which

Leiva was found discharging) be excluded pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). Dkt. # 115 at 5. This Court found that John's false statements in his EPA interview were admissible insofar as they were offered for their falsity and were admissible against Seattle Barrel as party admissions under Rule 801(d)(2)(D). *Id.* at 4. In December 2021, this Court excluded another interview statement by John Sanft (that Leiva, Louie Sanft, and "other guys" knew how to discharge caustic solution) due to it being facially incriminating to Louie Sanft. Dkt. # 181 at 2-3. Defendants now argue that the government improperly used several of John Sanft's statements against Louie Sanft at trial. Dkt. # 263 at 33-40.

This Court disagrees. Each of the statements by John Sanft at issue were either used because they were admissible against Seattle Barrel, *e.g.* the audio clip of John Sanft's interview that was immediately followed by a clip from Louie Sanft's interview (Tr. 2553), or the jury was reminded by this Court as to how to treat the testimony of John Sanft, thereby neutralizing any potential prejudice. The jury was instructed that John Sanft's statements were offered as evidence against Seattle Barrel only, except for two statements that were offered to show that they were false: 1) John Sanft's statement that he did not know about any openings to the sewer other than the discharge point connected to the wastewater treatment system, and 2) John Sanft's statement that he had no knowledge of discharges from Seattle Barrel to the sewer. Jury Instruction No. 20. This instruction was referenced in a curative fashion when, for example, defense counsel objected to the government's reference to Louie Sanft being told by John Sanft about the discharges during closing remarks. Tr. 2547. "Generally, when evidence is heard by the jury that… is applicable only to limited defendants or in a limited manner, a cautionary instruction from the judge is sufficient to cure any prejudice to the defendant." *United States v. Escalante*, 637 F.2d 1197, 1202-03 (9th Cir. 1980). Indeed, prejudice from statements relating to "the guilt of codefendants is generally held to be neutralized by careful instruction by the trial judge." *Id.* at 1201 (citation omitted). Because this Court

assumes that the jury listened to and followed this Court's instructions, and can compartmentalize evidence at it related to separate defendants, *id.*, this Court finds that the government did not improperly use John Sanft's statements against Defendants.

2.) *Lack of an instruction on lesser-included offenses*

Prior to trial, Defendants requested an instruction on the lesser included offense of negligent Clean Water Act discharges. Dkt. # 126 at 3-5 (Defendants' Joint Trial Brief). Defendants requested a jury instruction stating that Counts 2 through 30 include lesser offenses of "negligently discharging a pollutant into the waters of the United States without a permit issued by either the United States Environmental Protection Agency, or by Washington State." Dkt. # 118, at Instruction No. 23 (Defendants' Joint Proposed Jury Instructions). Defendants proffered the following definition of negligence:

> "An offense is committed negligently where a defendant fails to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances. Ordinary Care is defined as the care a reasonably careful person would exercise under the same or similar circumstances."

*Id.* The government opposed the request. Dkt. # 196 at 8-12 (Government's Response to Defendants' Submissions RE: Jury Instructions). Ultimately, jurors were not provided with Defendants' proposed negligence instructions. *See* Dkt. # 215 (Court's Instructions to the Jury). Defendants argue that, as to Counts 2-30, a rational jury could have found that Louie Sanft and Seattle Barrel negligently, as opposed to knowingly, caused the caustic discharges, and this Court's failure to instruct the jury as such amounted to reversible error. Dkt. #263 at 41; Dkt. # 267 at 5. This issue has been thoroughly briefed, argued, and considered by this Court prior to the filing of Defendants' post-trial motions—including during trial after Louie Sanft's testimony. *See* Dkt. # 196 at 8-12; Tr. 2148- 2150; 2164-2166; 2383-2397. At each juncture, this Court reaffirmed its decision that the evidence presented did not warrant the inclusion of a lesser included offense, and

does so again at this time.

To warrant a lesser included offense instruction, "the defendant must prove that the offense on which instruction is sought is a lesser-included offense of that charged." *United States v. Hernandez*, 476 F.3d 791, 797 (9th Cir. 2007) (quoting *United States v. Fejes*, 232 F.3d 696, 703 (9th Cir. 2000)). The government does not dispute that Section 1319(c)(2(A) qualifies as a lesser included offense of the knowing violation of Section 1319(c)(2(A) set forth in Counts 2 through 30. What the government disputes is that "the evidence at trial [is] such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater." *Hernandez*, 476 F.3d at 798 (quoting *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989)). Here, Defendants' arguments in support of a lesser offense instruction are not compatible with the facts advanced by the government in this case: that Leiva knowingly and purposefully discharged caustic solution into the sewer, and Sanft knew about it. That Leiva did this knowingly is undisputed. The facts presented at trial did not warrant a negligence instruction.

Seattle Barrel argues that a rational jury could have found that Leiva discharged into the sewer to benefit himself only, and Seattle Barrel was therefore only negligent in failing to prevent Leiva from doing so. Dkt. # 267 at 10. However, for the reasons discussed above, the evidence did not show (and the jury did not find) that Leiva acted for his own benefit alone. *See supra* Section IV(a)(3). Louie Sanft was similarly not entitled to a lesser-included offense instruction. The jury was instructed on aiding and abetting (Jury Instruction No. 34) and responsible corporate officer (Jury Instruction No. 35) theories of liability, and based on the evidence presented, reached a guilty verdict as to Louie Sanft. As explained, the government's case was based on the theory that the illegal discharges were open and known by Seattle Barrel employees and management, including Louie Sanft. Defendants countered that Leiva was lying and was a lazy employee who took shortcuts. Tr. 2591-2592. As the government notes, Defendants put forth no evidence or argument to push back on the widely accepted theory that Leiva

ORDER – 32

engaged in purposeful conduct or to show that the discharges were in fact accidental. The record does not support a lesser-included negligence offence instruction, and the Court declines to order a new trial on this basis.

     3.) *The weight of the evidence*

A district court should only grant a new trial in an "exceptional case in which the evidence weighs heavily against the verdict." *United States v. Merriweather*, 777 F.2d 503, 507 (9th Cir. 1985) (citing *Pimentel*, 654 F.2d at 545)). Based on the Court's analysis of Defendants' various motions seeking a new trial, it is clear that the government's case did not *only* rely on the testimony of Leiva and that a reasonable juror could in fact find Leiva's testimony credible. Defendant's motion for a new trial under Rule 33 is **DENIED.**

### c.) Defendants' Rule 29 Motion for Acquittal or New Trial on Count 35 (Dkt. ## 265, 268)

Defendants seek a new trial on Count 35, a false statement to the United States. The government alleged that Louie Sanft and Seattle Barrel represented to an EPA agent that Seattle disposed of the caustic solution by evaporating it from the tank. Dkt. # 1 at 12. Again, to prevail on a request for a new trial, Defendants must show that the evidence preponderates heavily against the jury's verdict. Louie Sanft argues that the number of witnesses who corroborated his statement supports the truth of his statement, and because any evidence of knowledge or willfulness on the part of Sanft relies on the testimony of Leiva, the evidence preponderates against Sanft's guilt. Dkt. # 265 at 11. This Court adopts the analysis set forth in its June 22, 2022, Order denying Defendants' motion for acquittal and deferring ruling on Defendants' request for a new trial on Coutn 35 due to the newly-found discovery and supplemental briefing concerning Leiva's credibility. As discussed above, Defendants have not shown that the evidence preponderates heavily against conviction on Count 35, based on Leiva's credibility, or otherwise. Accordingly, Defendants' request for a new trial on Count 35 is **DENIED.**

ORDER – 33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

For the reasons stated above, Defendants' Motions for a New Trial, or Dismissal of the Indictment are **DENIED** (Dkt. ## 263, 267, 311). Defendants' Motions for a New Trial on Count 35 are **DENIED** (Dkt. # 265, 268).

DATED this 23rd day of August, 2023.

The Honorable Richard A. Jones
United States District Judge

ORDER – 34